UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ORBIT ONE COMMUNICATIONS, INC.,
and DAVID RONSEN,

    Plaintiffs/Counterclaim Defendants,

    - against -

NUMEREX CORP.,

    Defendant/Counterclaim Plaintiff.

Civil Action No. 08-0905 (LAK) (JCF)

---

NUMEREX CORP.,

    Plaintiff/Counterclaim Defendant,

    - against -

SCOTT ROSENZWEIG, GARY NADEN, and
LAVA LAKE TECHNOLOGIES, LLC,

    Defendants/Counterclaim Plaintiffs.

Civil Action No. 08-6233 (LAK) (JCF)

---

GARY NADEN, DAVID RONSEN, SCOTT
ROSENZWEIG, ORBIT ONE
COMMUNICATIONS, INC., and LAVA LAKE
TECHNOLOGIES, LLC,

    Plaintiffs/Counterclaim
    Defendants,

    - against -

NUMEREX CORP.,

    Defendant/Counterclaim
    Plaintiff.

Civil Action No. 08-11195 (LAK) (JCF)

**MEMORANDUM OF LAW IN SUPPORT OF NUMEREX CORP.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

Kent A. Yalowitz
Dorothy N. Giobbe
Emily A. Kim
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
*Attorneys for Numerex Corp.*

April 17, 2009

NY: 453788_8

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTS ...................................................................................................................................3

I.  The Parties .....................................................................................................................3

II.  Acquisition Negotiations ..............................................................................................4

    A.  Orbit One's Reckless Forecasting.........................................................................5

    B.  The Incomplete Axonn Disclosures......................................................................7

        1.  Background:  Orbit One Hired Naden from Axonn.....................................8

        2.  February 2006:  Axonn Threatens Litigation Again...................................8

        3.  Orbit One Failed to Disclose Axonn's Litigation Threats in the APA.........................................................................................................12

III.  The Transaction ..........................................................................................................13

IV.  Post-Closing Developments........................................................................................13

    A.  Axonn Threatens Litigation Promptly after Closing ...........................................14

    B.  The Division Performs Poorly ............................................................................14

    C.  Ronsen Prepares to Sue Numerex.......................................................................16

    D.  Ronsen Misappropriates Numerex Computers and Electronically Stored Information ..........................................................................................................16

    E.  The Stratix Subterfuge .......................................................................................17

    F.  Orbit One and Ronsen Commence Litigation and Continue to Misappropriate Numerex Property ......................................................................19

ARGUMENT.........................................................................................................................21

I.  SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING ORBIT ONE'S CLAIM FOR BREACH OF THE APA DUE TO LACK OF "CORPORATE SUPPORT"....................................................................................21

    A.  The APA Does Not Promise Corporate Support ..................................................22

i

|   |   | B. | Orbit One Suffered No Injury Caused by Any Alleged Lack of Support | ..............22 |

| II. | | | SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST RONSEN ON HIS CLAIM OF BREACH OF HIS EMPLOYMENT AGREEMENT | ..........................23 |
|   | A. | | Ronsen's Title Was President of the Division | ......................................24 |
|   | B. | | Ronsen Had Authority as President of the Division | ..............................25 |

| III. | | | SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST ORBIT ONE AND RONSEN ON THEIR DECLARATORY JUDGMENT CLAIM BECAUSE RONSEN DID NOT HAVE "GOOD REASON" TO RESIGN | .......................................27 |
|   | A. | | There Was No "Material Reduction" of Ronsen's Duties or Authority | ...............28 |
|   | B. | | Ronsen Did Not Have "Good Reason" Based on Numerex's Setoff | ....................29 |
|   |   | 1. | The APA Preserved Numerex's Setoff Rights | ............................29 |
|   |   | 2. | A Breach of the APA Is Not a Breach of the SNC | .................................31 |

| IV. | | | PLAINTIFFS' CLAIMS OF UNJUST ENRICHMENT AND BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING SHOULD BE DISMISSED | ..........32 |

| V. | | | PLAINTIFFS FRAUDULENTLY INDUCED THE APA AND MATERIALLY BREACHED IT EXCUSING NUMEREX FROM FURTHER PERFORMANCE | .........33 |

| VI. | | | NUMEREX SHOULD RECEIVE SUMMARY JUDGMENT ON LIABILITY FOR BREACH OF WARRANTIES AND REPRESENTATIONS | ................................33 |
|   | A. | | Orbit One Breached Representations and Warranties Relating to Axonn | .............34 |
|   |   | 1. | Orbit One Breached the No Litigation Warranty | .......................................34 |
|   |   | 2. | Orbit One Breached the Intellectual Property Warranty | ............................36 |
|   |   | 3. | Orbit One Breached the Full Disclosure Warranty | ....................................36 |
|   | B. | | Orbit One Expressly Indemnified Numerex for Any Breaches of the Express Representations and Warranties in the APA | ............................................37 |

| VII. | | | PLAINTIFFS FRAUDULENTLY INDUCED NUMEREX TO ENTER INTO THE TRANSACTION | ..................................................................................................37 |
|   | A. | | Plaintiffs Omitted Material Facts | ...........................................................37 |
|   | B. | | Plaintiffs Acted with the Requisite Scienter | ...........................................38 |

|  |  | 1. | Circumstantial Evidence of Conscious or Reckless Behavior | 39 |
|  |  | 2. | Motive and Opportunity | 40 |
|  | C. |  | Numerex Relied on Plaintiffs' Representations and Suffered Injury | 41 |
| VIII. |  |  | RONSEN, ROSENZWEIG, AND NADEN BREACHED FIDUCIARY DUTIES | 42 |
|  | A. |  | Ronsen, Rosenzweig, and Naden Schemed to Concoct Evidence against Numerex | 43 |
|  | B. |  | Stealing Evidence | 45 |
|  | C. |  | Self-Dealing in Connection with the Stratix Renewal | 45 |
| IX. |  |  | SUMMARY JUDGMENT SHOULD BE GRANTED TO NUMEREX ON ALL OF ROSENZWEIG AND NADEN'S CLAIMS | 46 |
|  | A. |  | Rosenzweig and Naden Have No Standing to Assert Claims Based on Breach of the APA | 46 |
|  | B. |  | Numerex Did Not Breach Rosenzweig's and Naden's SNCs | 47 |
|  | C. |  | Rosenzweig and Naden's Tortious Interference Claim Must Be Dismissed as a Matter of Law | 47 |
|  | D. |  | There Is No Evidence of "Good Reason" for Resignation or Constructive Discharge | 48 |

CONCLUSION .................................................................................................................. 49

NY: 453788_8

## Table of Authorities

**Page(s)**

**Cases:**

*Aaron Ferer & Sons Ltd.v. Chase Manhattan Bank, Nat'l Ass'n,*
731 F.2d 112 (2d Cir. 1984)................................................................................37

*Ainger v. Mich. Gen. Corp.,*
476 F. Supp. 1209 (S.D.N.Y. 1979),
*aff'd,* 632 F. 2d 1025 (2d Cir. 1980) .................................................................33

*Alpert v. 28 Williams St. Corp.,*
63 N.Y.2d 5557, 483 N.Y.S.2d 667 (1984) ......................................................42

*American Protein Corp. v. AB Volvo,*
844 F.2d 56 (2d Cir. 1988)................................................................................48

*Bankers Trust Co. v. Rhoades,*
859 F.2d 1096 (2d Cir. 1998)............................................................................47

*Bigda v. Fischbach Corp.,*
898 F. Supp. 1004 (S.D.N.Y. 1995), *aff'd,* 101 F.3d 108 (2d Cir. 1996) ..............45

*Bingham v. Zolt,*
66 F.3d 553 (2d Cir. 1995)................................................................................47

*Blue Chip Emerald LLC v. Allied Partners Inc.,*
299 A.D.2d 278, 750 N.Y.S.2d 291 (1st Dep't 2002) .................................42, 46

*Boers v. United States,*
44 Fed. Cl. 725 (Fed. Cl. Ct. 1999),
*aff'd,* 243 F.3d 561 (Fed. Cir. 2000) .............................................................30n.19

*Brass v. American Film Techs, Inc.,*
987 F.2d 142 (2d Cir. 1993)........................................................................37, 38

*CBS, Inc. v. Ziff-Davis Publ'g Co.,*
75 N.Y.2d 496, 554 N.Y.S.2d 449 (1990) ........................................................34

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
187 F.3d 229 (2d Cir. 1999)........................................................................38, 40

*Design Strategies, Inc. v. Davis,*
384 F. Supp. 2d 649 (S.D.N.Y. 2005),
*aff'd,* 469 F.3d 284 (2d Cir. 2006) ....................................................................42

*Ferguson v. Lion Holding, Inc.,*
312 F. Supp. 2d 484 (S.D.N.Y. 2004)..........................................................30n.19

**Page(s)**

*Frank Felix Assocs., v. Austin Drugs, Inc.*
    111F.3d 284, 289 (2d Cir. 1997)..................................................................47

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,*
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) (Kaplan, J.)....................................41

*G.K. Alan Assoc., Inc. v. Lazzari,*
    44 A.D.3d 95, 840 N.Y.S.2d 378 (2d Dep't 2007),
    *aff'd,* 10 N.Y.3d 941, 862 N.Y.S.2d 855 (2008)......................................32

*GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH Co.,*
    782 F. Supp. 763 (W.D.N.Y. 1991).............................................................43

*Glidepath Holding B.V. v. Spherion Corp.,*
    590 F. Supp. 2d 435 (S.D.N.Y. 2007)........................................................38

*Hall v. Earthlink Network, Inc.,*
    396 F.3d 500 (2d Cir. 2005)........................................................................33

*Harden v. Warner Amex Cable Commc'ns, Inc.,*
    642 F. Supp. 1080 (S.D.N.Y. 1986)............................................................28

*Harris v. Provident Life & Accident Ins. Co.,*
    310 F.3d 73 (2d Cir. 2002).........................................................................33

*Hondares v. TSS-Seedman's Stores, Inc.,*
    151 A.D. 2d 411, 543 N.Y.S. 2d 442 (1st Dep't 1989) ............................29

*In re Adelphia Business Solutions, Inc.,*
    322 B.R. 51 (Bankr. S.D.N.Y. 2005)..........................................................31

*In re First Cent. Fin. Corp. v. Ochs,*
    377 F.3d 209 (2d Cir. 2004)........................................................................32

*Junius Constr. Corp. v. Cohen,*
    257 N.Y. 393 (1931) ...................................................................................37

*Karas v. H.R. Labs., Inc.,*
    271 A.D. 530, 67 N.Y.S.2d 15 (2d Dep't 1946),
    *aff'd,* 297 N.Y. 494 (1947)........................................................................28

*Kaufman v. SunGard Invest. Syst,*
    No. Civ. A. 05-CV-1236, 2006 WL 1307882 (D.N.J. May 10, 2006) ....................45

*Landau v. Percacciolo,*
    50 N.Y.2d 430, 429 N.Y.S.2d 566 (1980) ................................................43

v

**Page(s)**

*LaSalle Bank Nat'l Ass'n v. Capco Am. Securitization Corp.,*
No. 02 CV. 9916, 2006 WL 177169 (S.D.N.Y. Jan. 25, 2006) ................................34

*Lerner v. Fleet Bank, N.A.,*
459 F.3d 273 (2d Cir. 2006) ......................................................................................38

*MacDraw, Inc. v. CIT Group Equipment Financing, Inc.,*
157 F.3d 956 (2d Cir. 1998) ......................................................................................32

*Marks v. Cowdin,*
226 N.Y. 138 (1919) ..................................................................................................28

*Maritime Fish Prods. v. World-Wide Fish Prods.,*
100 A.D.2d 81, 472 N.Y.S.2d 281 (1st Dep't 1984) ..........................................42, 46

*Meinhard v. Salmon,*
249 N.Y. 458 (1928) ..................................................................................................42

*Merrill Lynch & Co. v. Allegheny Energy, Inc.,*
500 F.3d 171 (2d Cir. 2007) ........................................................................33, 34, 41

*Metropolitan Coal Co. v. Howard,*
155 F.2d 780 (2d Cir. 1946) ............................................................................34, 41

*Missigman v. USI Northeast, Inc.,*
131 F. Supp. 2d 495 (S.D.N.Y. 2001) ......................................................................48

*Morgan Guaranty Trust Co. of N.Y. v. Republic of Palau,*
657 F. Supp. 1475 (S.D.N.Y. 1987) ..........................................................................38

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.,*
392 F.3d 520 (2d Cir. 2004) ......................................................................................22

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers,*
442 F.3d 101 (2d Cir. 2006) ......................................................................................49

*Phansalkar v. Anderson Weinroth & Co.*
344 F.3d 184 (2d Cir. 2003) ..............................................................................42, 46

*Pierce Ford Sales, Inc. v. Ford Motor Co.,*
299 F.2d 425 (2d Cir. 1962) ......................................................................................48

*RBFC One, LLC v. Zeeks, Inc.,*
367 F. Supp. 2d 604 (S.D.N.Y. 2005),
*aff'd*, 171 Fed. Appx. 906 (2d Cir. 2006) ................................................................48

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,*
570 F.2d 38 (2d Cir. 1978) ........................................................................................39

vi

**Page(s)**

*Rudman v. Cowles Commc'ns, Inc.,*
    30 N.Y.2d 1 (1972) ...............................................................................................29

*Stafford v. Scientia Health Group, Inc.,*
    19 Misc. 3d 1145(A), 867 N.Y.S.2d 20 (Sup. Ct. N.Y.Co.. 2008).........................................26

*United States v. Munsey Trust Co.,*
    332 U.S. 234 (1947).........................................................................................30n.19

*Vinas v. Chubb Corp.,*
    499 F. Supp. 2d 427 (S.D.N.Y. 2007).......................................................................48

*Watts v. Jackson Hewitt Tax Service Inc.,*
    579 F. Supp. 2d 334 (E.D.N.Y. 2008) ......................................................................39

*Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.,*
    499 F. Supp. 2d 233 (S.D.N.Y. 2007)...................................................................47-48

NY: 453788_8

## PRELIMINARY STATEMENT

This case arises from a multi-million dollar fraud committed by plaintiffs David Ronsen, Scott Rosenzweig, and Gary Naden. In Rosenzweig's own words, this dispute is about "Dave [Ronsen] and greed."

Ronsen, Rosenzweig, and Naden sold substantially all the assets of their company, Orbit One Communications, Inc. ("Orbit One") to Numerex Corp. ("Numerex") in an Asset Purchase Agreement (the "APA"). Orbit One was in the business of selling satellite tracking units and associated services, mainly as a subcontractor to the federal government. Orbit One made material misrepresentations of fact in the APA, and its three principals withheld material facts from Numerex in advance of the APA to induce Numerex to close the deal. They misled Numerex about an intellectual property dispute involving Orbit One's new product, the "SX-1" Tracking Unit, a product essential to the success of the business. Naden had been accused of using his knowledge of nonpublic patent applications to "design around" the pending patent in creating the SX-1 itself. Ronsen admitted that disclosing the true nature of this dispute would have been a "probable deal killer." As closing approached, Orbit One received repeated litigation threats about this dispute but did not disclose the threats to Numerex. Ronsen even received such a threat the evening before closing, but he hid it from Numerex. The APA's disclosure statement about the dispute made it appear that the matter had been dropped in November 2006. Plaintiffs even hid these threats from their own deal counsel, the Lowenstein Sandler firm. On deposition, plaintiffs' deal counsel testified that he could see how "Numerex would feel misled" by the failure to disclose.

Plaintiffs also misled Numerex about Orbit One's future prospects. Ronsen admitted on deposition that Orbit One's business plan was based on "predicted hurricane activity." Jeffrey Huhtanen, a former officer and shareholder of Orbit One, testified that if a "big hurricane or a big disaster" did not occur, "the sales would not happen," and that Orbit One's forecasting was like

throwing "darts on a dart board." In making projections, plaintiffs even disregarded information they received indicating that the federal government would curtail its tracker purchases. Plaintiffs' only concern just before closing was "not making the numbers." Indeed, they acknowledged among themselves that it was "likely" that they would miss their numbers "at some point" in the next two years by "20% or 25% . . . for two consecutive quarters," but they never disclosed this to Numerex.

Upon closing, Numerex paid Orbit One millions of dollars, escrowed cash and stock, and hired Ronsen, Rosenzweig, and Naden, entrusting them with the newly acquired entity, which operated as Numerex's Orbit One Satellite Division (the "Division"). Numerex paid the three generously, with executive salaries, cash bonuses, and benefits. The APA also included an Earn Out Matrix (the "Earn Out") under which Numerex would pay Orbit One (and, indirectly, Ronsen, Rosenzweig and Naden as the sole shareholders of Orbit One), additional cash and stock based on the extent to which the Division met, fell short of, or exceeded the Division's financial targets. These financial targets were based on SX-1 sales projections created by Ronsen, Rosenzweig, and Naden.

In the five months after closing, the business performed poorly in comparison to projections, due to poor SX-1 sales. The following chart illustrates these results:

| Month | Projected SX-1 Sales (units) | Actual SX-1 Sales (units) |
|---|---|---|
| August | 900 | 8 |
| September | 2,150 | 3 |
| October | 2,150 | -6 |
| November | 1,500 | 5 |
| December | 600 | 2 |
| **2007 Total** | **7,300** | **12** |

Naden testified: "[h]ad the weather cooperated as it was supposed to," the Division would have made its numbers. But by the end of September 2007, hurricane season had ended uneventfully.

So Ronsen, Rosenzweig, and Naden concocted a plan to blame Numerex for the poor performance, and claim (falsely) that Ronsen had been "stripped" of his authority. A mere sixty days

after closing, Ronsen delivered a ten-page, single-spaced letter to Numerex claiming that Numerex had failed to provide adequate "support" and that he now had good reason to resign because his "authority" had been taken away. These complaints (which are unsupported by the record) were designed to trigger a clause in the contract documents by which Orbit One could receive Earn Out payments constituting approximately 1.5 million shares of Numerex stock plus $2.5 million in cash. If Ronsen resigned for "Good Reason," Orbit One would receive the Earn Out payments whether they had been earned or not.

Plaintiffs also ginned up nuisance-level grievances, induced their subordinates to do the same thing, and even sent one another emails reminding themselves to be concerned with how things would "play in court." They also removed hundreds of thousands of pages of Numerex documents from Numerex's computer servers. And, as described below, they induced Numerex to "accept" renewal of a contract with the Division's largest customer, without disclosing that there was actually nothing to accept because Orbit One was contractually obliged to supply product upon renewal. They also failed to disclose that they were actually seeking this "acceptance" so that they could argue that Numerex owed Orbit One $1.75 million under the APA.

A mere five months after closing, plaintiffs commenced this action.

## FACTS[1]

### I.    The Parties

Numerex is a public company, traded on the NASDAQ. It is engaged in the business of machine-to-machine network services and solutions. Ex. 3.

Orbit One is a closely held corporation owned by plaintiffs Ronsen (84%), Rosenzweig (10%), and Naden (6%). Ex 4. Through 2007, Orbit One was engaged in the business of re-selling a

---

[1]    Referenced documents are attached as exhibits to the Declaration of Dorothy N. Giobbe executed on April 17, 2009 (the "Giobbe Declaration") and filed herewith.

satellite asset tracking product, the "T3," manufactured by a company called Axonn, L.L.C. ("Axonn"), and associated tracking services. *See* Ronsen Dep. 117, 120[2]; Naden Dep. 84; Ex 5. More than two-thirds of Orbit One's revenue came from a single contract with a company called Stratix Corporation ("Stratix"). Ronsen Dep. 48. Orbit One was a subcontractor and Stratix the prime contractor to the Federal Emergency Management Agency ("FEMA"). Rosenzweig Dep. 13, 279.

The years 2005 and 2006 were unusually profitable for Orbit One as a result of two extraordinary natural disasters, Hurricane Ivan and Hurricane Katrina.[3] For the years 2000 through 2006, Orbit One's earnings[4] were as follows:



| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|
| ■ Earnings | ($9,388) | $77,909 | ($60,880) | $135,360 | $92,116 | $3,051,968 | $3,945,724 |

In 2007, Orbit One began developing its own tracking unit, the SX-1, to replace Axonn's T3. *See* Ronsen Dep. 71. The SX-1 incorporated a satellite transmitting device, called the STX, manufactured by Axonn. Ronsen Dep. 589.

## II.     Acquisition Negotiations

On February 12, 2007, Numerex proposed a transaction in which it would purchase substantially all the assets of Orbit One for $4 million in cash at closing, plus a contingent earn out

---

2    Deposition transcripts are attached as Exhibit 2 to the Giobbe Declaration.
3    *See* Exs. 6, 7, 8 (Katrina); Exs. 9, 10; Huhtanen Dep. 67-68 (Ivan); Ronsen Dep. 37-38.
4    The figures come from Orbit One's un-audited financial information supplied to Numerex [2000-2004] Ex. 8; and Orbit One's audited financial statements [2005 and 2006] Ex. 11.

component that would enable Orbit One to earn additional amounts of cash and stock subject to the achievement of financial objectives. Ex. 12.

### A.      Orbit One's Reckless Forecasting

On February 27, 2007, Ronsen wrote to Numerex on behalf of Orbit One, stating that the contingent component of the transaction was undesirable to Orbit One, that "[w]e believe that the company will continue to grow and become stronger." Ex. 13. The February 27 letter projected growth of 15% to 20% per year. *Id.* In contrast to Ronsen's confident projections in his letter, Orbit One's management testified on deposition in this case that its business depended on the occurrence of a major hurricane or other extraordinary natural disaster. Ronsen admitted that "our plan was built to take into consideration . . . normal or predicted hurricane activity." Ronsen Dep. 146. Naden stated that "[w]e didn't have the hurricane season as was forecasted or predicted." Naden Dep. 79-80. He added, "[h]ad the weather cooperated as it was supposed to," the Division would have achieved its numbers. *Id.* Jeffrey Huhtanen, a former officer and shareholder of Orbit One, testified that Orbit One's forecasts were typically pinned on the "hope that a big hurricane or a big disaster would hit . . . . If that didn't happen . . . the sales would not happen." Huhtanen Dep. 36. Mr. Huhtanen likened Orbit One's process of preparing forecasts to throwing "darts on a dart board." *Id.* at 37. Orbit One did not disclose to Numerex that its forecast—and the Earn Out targets later premised on the forecast—was predicated on the assumption that a major hurricane would occur. *See* Fienberg Dep. 34-37; Catherall Dep. 357-60.

Numerex maintained its position that a contingent component was necessary in order to apportion the risk of the proposed transaction. Fienberg Dep. 14-18, 23. On March 28, 2007, the parties signed a non-binding Letter of Intent (the "LOI"). Ex. 14. The LOI anticipated $6 million payable at or within 60 days of closing, plus additional cash and stock payable "subject to

achievement of financial objectives." *Id.* Attached to the LOI was an "Earn Out Matrix," setting goals of $1.625 million EBITDA for the period of July to December 2007, $4.25 million for 2008, and $5.25 million for 2009. *Id.*

Following execution of the LOI, Orbit One's management provided a draft of a financial forecast to Numerex. Rosenzweig Dep. 34. Numerex commented on the draft and suggested changes. Ex. 15; Fienberg Dep. 130. Numerex relied on Orbit One's expertise in the satellite business for the bona fide of the forecast. Catherall Dep. 107. In July 2007, Orbit One sent a final version of the forecast to Numerex. Ex. 16, Ex. 17.

On May 3, 2007, David Biggs, an employee of Axonn, sent Ronsen an e-mail informing Ronsen that he had learned from Stratix (the prior contractor to FEMA), that "in the most recent correspondence from FEMA . . . no sale of new trackers was projected." Ex. 18. Ronsen testified that he disregarded this information in preparing the forecast and did not disclose it to Numerex. Ronsen Dep. 121.

During 2007, Orbit One was developing a new product called the "SX-1" to compete with Axonn's T3. *See* Ronsen Dep. 71. The success of Orbit One's business depended on the successful development and deployment of the SX-1. *Id.* Revenue from the SX-1 was built into the Orbit One forecast. The July forecast anticipated sales of 7,300 SX-1 units in the second half of 2007; approximately 27,000 units in 2008; and approximately 36,000 in 2009. Ex. 15.

Ronsen provided Numerex with an SX-1 sales prospect list of 29 potential customers. Ex 19. Yet Ronsen testified that, apart from six companies that Orbit One knew and had worked with in the past, the companies on the list all had a zero-to-five percent chance of becoming customers. Ronsen Dep. 88-90. Ronsen did not disclose this to Numerex prior to the closing. *See id.*

At the end of July, just before closing, Ronsen had a conversation with Rosenzweig in which

Ronsen expressed that his only concern prior to closing was "not achieving the earn out by not hitting the numbers." Rosenzweig Dep. 112-113; Ex. 20. Indeed, Rosenzweig wrote to Ronsen and Naden on July 30 that it was "likely" that they would miss their numbers "at some point" in the next two years by "20% or 25% . . . for two consecutive quarters." Ex. 21. None of them disclosed this concern to Numerex. Numerex relied on the forecast provided by Orbit One. Catherall Dep. 107, 372.

### B.       The Incomplete Axonn Disclosures

On March 31, 2007, Numerex sent Orbit One a diligence checklist. Ex. 22, Ex. 23. One of the items on the checklist asked Orbit One for a "[d]escription of any currently threatened litigation, legal claims, regulatory actions or other actions or proceedings, including any correspondence relating to any alleged infringement of any patent, trademark, or other intellectual property." Ex. 23 (item 7b). In response, Orbit One provided the following chronology regarding its relationship with Axonn, its key supplier:

- Orbit One enters Continuity of Supply and First Addendum Exclusivity Agreement – April 15, 2005
- Gary leaves Axonn to begin work at Orbit One – May 2006
- Axonn, not happy about Gary leaving, issues demand letters to Orbit One and Gary Naden – June 2006
- Correspondence exchange in the following 2 months culminating in no subsequent actions.
- Axonn enters Second Addendum to Continuity of Supply Agreement granting Orbit One access to STX technology – November 2006
- Axonn currently negotiating to grant more license rights – in work

Ex. 24. The disclosure concluded, "[w]hile the relationship remains strained, we continue to do business and are actively working with Axonn senior management to minimize future disputes." *Id.*

During the course of diligence, Numerex asked for additional information about this. For example, on June 8, 2007, Numerex Senior Vice President Louis Fienberg asked Ronsen to provide "[d]ocumentation from counsel or others supporting OOC's position that it is not infringing on

Axxon's [*sic*] IP.  I believe we saw some correspondence previously – want to make sure we have everything."  Ex. 25.  Orbit One did not disclose everything.  Here are the facts.

### 1.   Background:  Orbit One Hired Naden from Axonn

In May 2006, Orbit One hired Naden away from Axonn.  *See* Ex. 26; Naden Dep. 138-46. Naden was Chief Technology Officer at Axonn.  Ex. 28.  In his employment agreements with Axonn, he had agreed not to work for a competing company for two years following his Axonn employment. Ex. 27 § 6.1.  Naden had also agreed to keep confidential Axonn's proprietary and trade secret information.  Ex. 27 § 6.2.

Naden resigned on May 10, 2006.  Naden Dep. 146-48.  On June 29, Axonn's attorneys sent a letter to Ronsen and Naden threatening litigation.  Ex. 28.  Axonn alleged that Naden had violated his noncompetition obligations and breached his fiduciary duty to Axonn.

In November 2006, Orbit One and Axonn entered into an amendment to a "Continuity of Supply Agreement."  Ex. 29.  However, Naden testified that the amendment did not resolve Axonn's litigation threat.  Naden Dep. 236, 239-40, 242-43.

### 2.   February 2006:  Axonn Threatens Litigation Again

In a February 2, 2007 e-mail, Axonn stated that it "ha[d] let the lawsuits between Axonn and [Naden] and Axonn and Orbit One go dormant for a period in the hopes that both companies would just get on with business" but continued that if Naden did not sign certain patent assignments it was requesting, Axonn would "take the steps . . . necessary to bring the patent issues to closure."  Ex. 30. Ronsen wrote to a business associate that Axonn had renewed its "threat of legal action."  Ex. 30.  In a separate e-mail, Rosenzweig expressed frustration over "the continuing and repeated threat of legal action" by Axonn, stating that Orbit One had to respond to Axonn's "latest legal threat."  Ex. 31. Axonn alleged that Naden and Orbit One were using Naden's knowledge of Axonn's nonpublic

8

patent application to "design around" those patent applications in developing the SX-1 tracker.
DiBella 38, 41-46, 55-56; *see* Ex. 32, Ex. 33. Axonn confronted Ronsen with this information and
demanded to meet with Orbit One. DiBella Dep. 55-56.

Ronsen immediately recognized the impact that Axonn's legal threats could have on a merger
with Numerex: the day after Numerex's Louis Fienberg sent him the draft LOI on February 12,
Ronsen described Axonn's threats as "a probable deal killer." Ex. 12, Ex. 30. In an e-mail to Naden
regarding the disputed patent issues, Ronsen wrote that "this is of the absolute highest significance to
our future existence as a company . . . ." Ex. 34.

Orbit One did not disclose this correspondence to Numerex. Instead, in March 2007, Ronsen
and Naden met with Axonn, with the stated goal of trying to "eliminate/suspend contractually any
prior legal grievances" between Orbit One and Axonn. Ex. 35; *see also* Ex. 36. Following a March
27 meeting in Covington, Louisiana, Ronsen circulated a draft settlement agreement. DiBella Dep.
56; Ex. 37, Ex. 35, Ex. 38, Ex. 39. The day after the March 27 Axonn meeting in Covington, Orbit
One signed the LOI. Ex. 14.

In April, after Naden provided Axonn with an affidavit for an unrelated matter, Ronsen called
DiBella, saying "[n]ow that Gary is cooperating with the patent attorneys on the assignment, we need
something from you." Naden Dep. 246; Ex. 14; DiBella Dep. 116. Ronsen asked DiBella for a letter
(purportedly for Orbit One's auditors), stating that Axonn would not pursue its legal claims against
Orbit One. DiBella Dep. 161-62. On April 23, 2007, Axonn sent a letter to Orbit One stating that it
"presently has no intention of pursuing the claims outlined in [the] June 29, 2006 letter to Orbit One .
. . ." Ex. 40; DiBella Dep. 161-62. Naden knew the letter "was not a retraction of [Axonn's] legal
threat." Naden Dep. 249-50. But this April 23 letter figured prominently in future disclosures about
disputes with Axonn. Ex. 41; Ronsen Dep. 542-44.

In May, Axonn shipped to Orbit One 10,000 STX units but insisted it would only do so under a reservation of rights concerning its ongoing disputes with Orbit One. *See* Ex. 42, Ex 43, Ex. 44. A flurry of e-mails followed. *E.g.*, Ex. 45, Ex. 46. On May 4, Axonn wrote to Ronsen:

> We are working with you (Orbit One) and Gary at this time to try to resolve a confidential information issue that is part of Gary's continuing obligation to Axonn, which affects Orbit One, and which is not addressed in any of our existing agreements. The agreement we are currently attempting to reach with Orbit One and Gary through the several drafts that have been circulating the last month or so addresses the matter specifically . . . .
>
> The sole purpose of my several recent emails has been to have Orbit One understand and acknowledge that Axonn's shipment of STXs to Orbit One does not resolve the confidential information matter that was the subject of our discussions in Covington four weeks back . . . . That confidential information matter arose after the Second Addendum was completed last November . . . .

Ex. 43. Although Orbit One sent some correspondence to Numerex, it did not disclose the correspondence relating to the reservation of rights. Ex. 41.

Numerex again asked Ronsen, on June 8, to provide documentation concerning the Axonn issue. Ex. 25. Ronsen's reply was that "the only work that's been done is applicable to future options – please review our Axonn contract for 'license' to incorporate their technology." *Id.* He did not disclose the litigation threats in February or Axonn's reservation of rights in May. *See id.*

On June 18, 2007, according to Naden, Orbit One's relationship with Axonn "took another left turn." Ex. 47. Axonn's Paul DiBella accused Ronsen in an e-mail of reneging on the oral agreement they had reached in March during the Covington meeting:

> [W]e were trying to resolve a number of serious issues regarding trade secrets, confidential information and other things . . . . [Y]ou are now unwilling to follow through on what you agreed to in Covington . . . .
> I have had the opportunity to see some things firsthand. And I don't like what I see. You looked me in the eyes and shook my hand on an agreement in Covington. I expected you to live up to that agreement, written or not. You have not. In fact, you purposefully departed from it. Period, no excuses. We are terminating any further discussions on the agreement.

*Id.* Naden expressed in an e-mail to Ronsen that he did not "know what the right answer is, but it probably can't get worse . . . ." Ex. 48. Ronsen, Rosenzweig, and Naden did not provide a copy of

Axonn's June 18 e-mail to Numerex. *See* Ex. 1; Ex. 13; Ex. 2.

On June 22, in response to questions from Numerex, Naden re-sent the April 23 "no litigation" letter from Axonn, without disclosing the correspondence threatening litigation, reserving rights, and terminating settlement discussions. Ex. 41. On June 25, despite the June 18 e-mail terminating settlement discussions just seven days before, Ronsen represented to Orbit One's auditors that "there is no pending or threatened litigation against Orbit One at this time" —a statement that Naden characterized as "an incorrect statement." Ex. 49; Naden Dep. 275-76.

On July 19, 2007, Naden participated in a diligence telephone call with Scott Petty, a partner at the law firm of King & Spalding LLP. Scott Petty Decl., ¶¶ 1-2. Naden informed Petty that "[a]s of the date of our conversation, July 19, no further claims had been discussed with Axonn." *Id.* at ¶ 3(2).

On the eve of closing, July 31, 2007, Ronsen received an e-mail from DiBella again threatening litigation:

> David, there is a major issue that remains unresolved at this time. That issue is Gary's use of Axonn confidential information and trade secrets. As you are aware, Gary admitted this to our attorneys. The agreement we were trying to complete with Orbit One and Gary after our meeting in Covington last April was intended to completely resolve this issue as well as some others.
>
> This is a very serious issue and it needs to be resolved once and for all. It continues to be a major contributor to the strained relationship between Orbit One and Axonn, and it is not going away by itself. I did not bring up this issue in my meeting with Stratton that you and he requested, or in the subsequent discussion with Stratton after he called me. When he called me, my response and confirming email to him spoke only to Orbit One's compliance with the purchase requirements under the Supply Agreement. This confidentiality issue is a separate issue under the Supply Agreement as well as agreements between Gary and Axonn. If Stratton were to specifically ask me if there are any other issues outstanding between Axonn and Orbit One, the answer would have to be yes.
>
> . . . . It is up to you as to whether you want to take another shot at resolving this through an agreement.

Ex. 50. Ronsen forwarded the e-mail to Naden and Rosenzweig, warning that it must be treated as

"CONFIDENTIAL." *See id.* None of the three disclosed the e-mail to Numerex. Ronsen Dep. 558. Nor did they disclose the e-mail to their own deal counsel at Lowenstein Sandler, who later stated that he would have remembered it if he had seen it because there was "[v]ery strong language in this e-mail." Pergola Dep. 200-01. Naden later stated that he would have been "concerned if . . . [Ronsen] had not disclosed [the e-mail] . . . [b]ecause it is a piece of relevant documentation that is necessary for Numerex to understand . . . ." Naden Dep. 298.

The transaction closed on August 1 without disclosure of the February litigation threats, the May reservation of rights, the June 18 "left turn," or the July 31 e-mail. Ronsen Dep. 558; Naden Dep. 294.

### 3. Orbit One Failed to Disclose Axonn's Litigation Threats in the APA

In Schedule 3.3(1) to the APA, Orbit One disclosed the existence of a historical dispute with Axonn. Ex.1, Schedule 3.3(1). The schedule purports to contain a chronology of the material events, again ending with November 2006:

- Seller and Axonn enter into the original AXTracker Continuity of Supply Agreement and the First Amendment—April 15, 2005.
- Naden leaves Axonn and becomes an employee of Seller—May 2006.
- Axonn delivers letters to Naden and Seller alleging that Naden breached confidentiality obligations to Axonn. Seller and Naden, in consultation with legal counsel, respond and deny any wrongdoing—June 2006.
- Further correspondence is exchanged in the subsequent two months, and no legal action results.
- Axonn and Seller enter into Second Amendment—November 2006.
- Axonn and Seller are currently negotiating the grant of additional license rights.

*Id.* Although Schedule 3.3(1) states that "the relationship remains strained," the schedule contains no mention of the February litigation threats; the May shipment of STX units subject to Axonn's reservation of rights; the June 18, 2007 e-mail terminating settlement discussions; or the July 31, 2007 e-mail threatening litigation. *See* Naden Dep. 294.

Indeed, the disclosure schedule contains no mention of any litigation threat from Axonn at

any time after November 2006, which Naden admitted remained a live issue during Orbit One's

negotiations with Numerex. Naden Dep. 273. Had Numerex seen Axonn's e-mails repeatedly

threatening litigation, Numerex would not have closed the transaction. Nicolaides Dep. 535-42.

## III.    The Transaction

Pursuant to the APA, Numerex paid Orbit One $5 million and placed $550,000 in cash and

approximately 1.5 million shares of Numerex common stock in escrow. Ryan Dep. 54-56. Some 60

days later, pursuant to the APA, Numerex paid Orbit One an additional $732,000. Ex. 51, Ex. 52.

The parties included the Earn Out as Exhibit B to the APA. Ex.1, APA Ex. B. Two days

before closing Rosenzweig wrote to Ronsen that "[t]he numbers" for the Earn Out "originate from

our forecast/budget." Ex. 53. Under the APA, the amount of "Earn Out" cash and stock payable to

Orbit One would vary based on the extent to which the Division met, fell short of, or exceeded the

Business Plan's financial targets. Ex.1, APA Ex. B.

Numerex placed the assets of Orbit One in a limited liability company called "Orbit One

Communications LLC (the "LLC"). *See* Nicolaides Dep. 125-26; 60. However, Ronsen,

Rosenzweig, Naden, and the other employees of Orbit One all became employees of *Numerex*—not

the LLC—and the contract documents contemplated expressly that Ronsen would be "President of

NMRX's Orbit One division (the 'Division')."[5]

The closing took place in New York on August 1, 2007, with Ronsen in attendance. Ronsen

Dep. 150. The Lowenstein Sandler firm represented Orbit One and delivered an opinion to Numerex

that, under New York law, the APA was binding and enforceable in accordance with its terms. Ex. 1,

APA Ex. F.

## IV.    Post-Closing Developments

---

[5]    Ex. 1, Ronsen Severance and Non-Competition Agreement ("SNC") § 1(a); *see also* Marett Dep. 42-43; Catherall
Dep. 142; Ronsen Dep. 234; Rosenzweig Dep. 83; Naden Dep. 166.

### A.    Axonn Threatens Litigation Promptly after Closing

Three weeks after closing, Axonn sent Orbit One a letter setting forth its "ongoing concern that Mr. Naden has and may be continuing to use and disclose trade secrets and other confidential information" he had learned while employed at Axonn. Ex. 54. It further stated that "Mr. Naden has advised Axonn that he has been using Axonn's confidential information, for example, to develop competitive products for Orbit One." *Id.* And the letter demanded that Orbit One "take appropriate steps to preserve all documents and evidence, including hard drives, back-up tapes, and other electronic data, pertaining to the issues" described in the letter. *Id.* Naden testified that he understood this as a threat of litigation. Naden Dep. 301, 302.

Numerex began negotiations with Axonn to resolve this threat. Ex. 55. Numerex's chief executive officer and general counsel participated in the negotiations, but, as eventually became clear to Axonn, Ronsen, as the president of the Division, held the authority to accept or reject an agreement with Axonn. DiBella 103-04. Negotiations lasted through December 2007, while Numerex prepared for the prospect of litigation.[6] Ultimately, no settlement was reached, and the threat of litigation by Axonn still persists. DiBella Dep. 104.

Pursuant to the APA, Orbit One indemnified Numerex for "any and all claims, losses, damages, liabilities, expenses or costs, including reasonable attorneys' fees," related to, among other things, the Axonn matter. Ex. 1, APA § 7.2. Ronsen, Rosenzweig, and Naden personally guaranteed this indemnity. *Id.*, Ex.1, APA Ex. I ("Guaranty"). However, the Guaranty required that Numerex first seek recourse against the cash and stock placed in escrow at closing. *Id.*

### B.    The Division Performs Poorly

During the first weeks of August, Ronsen, Rosenzweig, and Naden prepared a presentation

---

[6]    Ex. 55, Ex. 56, Ex. 57, Ex. 58, Ex. 59; Ryan Dep. 176, 178-79; DiBella Dep. 104.

for Numerex senior management in which they expressed that one of their product launch objectives was a "[s]hotgun [a]pproach" toward marketing. Ex. 5 at ORBIT00816834. They explained their strategy as "[s]pend a little to get the message out broadly" and then "[b]uild it and they will come." *Id.*

This "build it and they will come" marketing approach did not fare well. In August 2007, the Division sold eight SX-1 units—against a projection of 900 units. Ex. 141 (Catherall Decl. ¶ 4). September is the peak month for hurricane season. Ex. 60, Ex. 61, Ex. 62. In 2007, however, no Category 4 or Category 5 hurricane made landfall in the United States. Ex. 60, Ex. 61, Ex. 62. In September 2007, with no major hurricane, the Division sold three SX-1 units—against a projection of 2,150. Ex. 141 (Catherall Decl. ¶ 4).

At the end of September—just 60 days after closing—Ronsen, assisted by Rosenzweig and Naden, began working on a letter to Numerex senior management, blaming the poor performance of the Division on Numerex. Ex. 63. On October 5, 2007, Ronsen delivered this letter. *See id.* The letter contended that Ronsen and his team "have received little meaningful support whatsoever." Ex. 63 at 34203. It also contended that "my duties as President of Orbit One have been reduced considerably and are no longer customary of a Division President." *Id.* at 34204.

In response to this letter, Numerex redoubled its efforts with Ronsen, including him in weekly meetings of Numerex senior management and inviting him to a senior management retreat, which he attended. Ronsen Dep. 605; Nicolaides Dep. 179, 196. Despite these efforts, senior Numerex management found Ronsen to be increasingly disruptive.[7]

Meanwhile, SX-1 sales continued to fall short of forecasts. In October, returns of SX-1 demo

---

[7]    Nicolaides Dep. 116-17; 173, 177-79; Nicolaides Dep. 484; Marett Dep. 25; Catherall Dep. 266, 381; Ex. 64, Ex. 65, Ex. 66, Ex. 67, Ex. 68, Ex. 69, Ex. 70, Ex. 71, Ex. 72, Ex. 73, Ex. 74, Ex. 75, Ex. 76, Ex. 77, Ex. 78, Ex. 79, Ex. 80, Ex. 81, Ex. 82, Ex. 83, Ex. 84, Ex. 85, Ex. 86.

units exceeded sales—so that the net sales were "negative six"—against a projection of 2,150 units. Ex. 141 (Catherall Decl. ¶ 4); *see, e.g.*, Rosenzweig Dep. 240-43; Ex. 87, Ex. 88. In November, the Division sold five units, against a projection of 1,500 units. Ex. 141 (Catherall Decl. ¶ 4). And in December, the Division sold two units, against a projection of 1,500. *Id.*

Total sales from August through December were 12 units, against a projected 7,300.

### C.    Ronsen Prepares to Sue Numerex

Starting in early December 2007, Ronsen consulted Lowenstein Sandler and began preparing a complaint. Ronsen Dep. 388-89. In a meeting on December 19, 2007, Ronsen handed Numerex's CEO a letter from Lowenstein Sandler. Ex. 89. The letter stated: "On December 31, 2007, this firm will sue Numerex . . . unless, prior to that date, you have agreed to [our] settlement terms. The suit will seek the full earn out amount, as well as costs and fees." *Id.* The letter contended that "Numerex has failed to provide agreed upon marketing, sale and other support," that Numerex had "improperly restricted Mr. Ronsen from exercising his discretion in spending the budget actually provided," and that Mr. Ronsen had grounds to terminate his employment with good cause. *Id.* Numerex attempted to resolve Ronsen's complaints, but Ronsen made it clear that "[i]f Numerex is not willing to discuss guaranteeing a significant portion of the earn out, then I don't know that any resolution is likely." Ex. 90.

### D.    Ronsen Misappropriates Numerex Computers and Electronically Stored Information

In late 2007, Ronsen, Rosenzweig, and Naden began copying electronically stored information from Numerex's servers. *See* Ex. 141 (Dingman Decl. ¶ 7-8); Ex. 91 (Pls. Resp. 1). Ronsen, with Rosenzweig's and Naden's approval, induced a Numerex employee under Ronsen's

supervision to assist in the copying and deletion of e-mails.[8]  Ronsen told the Numerex employee that

he had the approval of senior Numerex management in doing so.  Ex. 141 (Dingman Decl. ¶ 9).

Ronsen did not have such approval.  Ex. 141 (Nicolaides Decl. ¶ 7).

The documents Ronsen took were the property of Numerex sold to Numerex under the APA.[9]

Ronsen kept this removal of Numerex documents secret from Numerex's senior executives.  Ex. 141

(Nicolaides Decl. ¶ 7).  Later, after they all quit, Ronsen, Rosenzweig and Naden formed Lava Lake

for the purpose of competing with Numerex.  *See* Ronsen 319-320.

### E.    The Stratix Subterfuge

At the time of Numerex's acquisition of Orbit One, a contract with Stratix, Orbit One's most

important customer, was in place.  *See* Ex. 1, Schedule 1.3(a)(iii).  Schedule 1.3(a)(iii) of the APA

provided for a cash payment to Orbit One upon extension of the Stratix contract "on similar terms,

conditions, economics and quantity" as the original contract.  *Id.*  The APA specified that "if there are

changes to the terms and conditions of the Original 2007 Stratix Agreement agreed to as a part of the

extension described above, and *NMRX shall have agreed to such changes*, then the conditions to

payment contained in this provision will be deemed to have been met, *with such provisions as to*

*which NMRX and Seller will have agreed at the time*."  *Id.* (emphasis supplied).

Ronsen, Rosenzweig, and Naden knew that the Stratix contract would be renewed on worse

terms starting November 2007 and that the renewed terms were not a very good deal for the

Division.[10]  They studied Schedule 1.3(a)(iii), discussing its terms in e-mail among themselves, and

were aware that they "needed Numerex's acceptance to get paid . . . [b]ecause of the reduction in

---

[8]     Ex. 91 (Pls.' Resp. 1); Ronsen Dep. 382, 384, 387; Ex. 141 (Dingman Decl. ¶ 8, Black Decl., Oct. 10, 2008 ¶ 3, Webb Decl. ¶ 5).
[9]     Ex. 91 (Pls.' Resp. 1); *see* Ex. 1, § 1.1(a)(x) (sale of "all information, files . . . and recorded knowledge"); Ronsen Dep. 372-74; 376-78; 380-82 (admitting the documents he took were Numerex property).
[10]    Ronsen Dep. 460, 464, 466-67; Rosenzweig Dep. 258-59, 301; Ex. 92.

units" under this provision.[11]  When Ronsen disclosed the specific terms of the proposed renewal to

Numerex's Michael Marett on the Friday before Christmas, Ronsen down-played the reduction,

stating that the Stratix contract had "decreased somewhat."  Ex. 95.

At the end of December 2007, Ronsen pushed Marett to "please approve today so that we can

commit our services to [Stratix] in time to get their contract signed before the end of the year."  Ex.

95; Rosenzweig Dep. 300.  Marett responded that Ronsen should "move forward."  Ex. 96.

Numerex then processed a purchase order from Stratix on the reduced terms, and Ronsen,

Rosenzweig, and Naden applied extensive pressure on Marett to "accept" the reduction by January 7.

Ex. 96.  The three made it appear that there was an urgent business reason to wrap up negotiations

with Stratix and that doing so would benefit Numerex, without disclosing their self-interest.  *See*

Rosenzweig Dep. 307-09, 321; Ex. 97, Ex. 98, Ex. 99.  Rosenzweig and Naden informed Marett that

Numerex would not be in compliance with its contract with Stratix if they did not act quickly.  Marett

Dep. 103.  Ronsen wrote in an e-mail to Marett, "the letter of our contract with Stratix forces us to

invoice no later than the 7th in order to receive payment within 30 days from the invoice date.  We do

not wish to stray past the 7th."  Ex. 99; *see also* Rosenzweig Dep. 290-91.  Once Marett gave verbal

approval, Ronsen insisted on written confirmation that Numerex "accepted" Stratix's purchase order,

again without disclosing his self-interest.  Ex. 99.

In reality, there was nothing for Numerex to "accept."  Under the contract with Stratix, Orbit

One was obligated to deliver units against Stratix's order, provided it met a certain minimum

threshold amount, which the proposed order did.  *See* Ex.101.  As Rosenzweig put it in an e-mail to

Ronsen while they were applying pressure on Marett to "accept":  "We, however, are obligated . . . .

There is no no option, so . . . where's the 'decision' we're waiting for?" Ex. 102; *see also*

---

[11]    Ex. 93, 94; Rosenzweig Dep. 273-77; Ronsen Dep. 481.

Rosenzweig Dep. 280-81, 284-85; Ronsen Dep. 472. The decision Ronsen wanted, as Ronsen wrote

in a separate e-mail on January 7, was that "[i]f [Numerex] accept[s] the Stratix PO, they will owe

$1.75M" to Plaintiffs.[12] The three never disclosed to Numerex that there was no "no" option, even

though Rosenzweig admitted it "would have been reasonable" to have done so.[13]

  As soon as Marett confirmed "acceptance" in writing, Ronsen sent an e-mail to Numerex's

CFO Alan Catherall on January 8, stating that:

> we successfully extended our Stratix contract, which triggers an APA payment. We have
> calculated that payment to total $1.75M (calculation below). As there is no provision or other
> reason for payment to be unnecessarily delayed or withheld, we would expect that it be made
> in a reasonable amount of time, say, by the end of the work week.

Ex.105. Ronsen had already filed his lawsuit against Numerex. Ex. 104.

  Numerex paid the amount Ronsen demanded under Schedule 1.3(a)(iii), but with a reservation

of its rights. Nicolaides Dep. 215-16; Ex. 106.

### F. Orbit One and Ronsen Commence Litigation and Continue to Misappropriate Numerex Property

  Orbit One and Ronsen commenced this action a mere five months after closing. Ex. 104. On

March 10, 2008, Numerex answered and asserted counterclaims against Orbit One and Ronsen,

including a claim for indemnification arising out of the unresolved Axonn claims. Ex. 107. On

March 27, 2008—and in accordance with the terms of the APA and the Guaranty—Numerex

informed Orbit One that it was exercising its setoff rights.[14] Ex. 108.

  In January 2008, Ronsen removed backup tapes containing sensitive Division information

from Numerex's offices in Bozeman and took them with him. Ex. 91 (Pls.' Resp. 4). He also

---

[12] Ex. 103; Rosenzweig Dep. 288-89, 310-11, 318, 323-24; Ronsen Dep. 484; *see also* Ex. 104.
[13] Rosenzweig Dep. 296, 298, 309, 316-17; Ronsen Dep. 472-73.
[14] At closing, all parties were aware that, because of revenue from the existing Stratix contract, the post-closing entity would likely achieve EBITDA and revenue targets for the first five months after closing. The Satellite Division did, in fact, achieve some portion of the Earn Out targets for 2007 due to revenues from the existing Stratix contract, despite the poor performance of the Satellite Division.

removed from the Bozeman office a desktop computer containing information about Division business. Ex. 91 (Pls.' Resp. 10); Ronsen Dep. 409-12. He later sold the desktop to a third party who destroyed the computer with Ronsen's knowledge. Ronsen Dep. 412-16, 427-29.

Orbit One also paid for a hard drive used by Rosenzweig in January 2008 for the purpose of copying information from his Numerex e-mail account, his storage space on Numerex's server, and his laptop computer hard drive. Ex. 91 (Pls.' Resps. 1, 10); Ronsen 412-18; Ex. 141 (Dingman Decl. ¶ 12). After copying this information, Rosenzweig took the hard drive. Ex. 91 (Pls.' Resp. 1).

From January to April, Ronsen remained in his position as President of the Division and a Numerex employee. Numerex senior management found his conduct disruptive and adversarial. Nicolaides Dep. 484; Catherall Dep. 266, 364-65; Marett Dep. 237. On April 5, 2008, Numerex sent Ronsen a letter stating that he had breached his fiduciary duties and responsibilities to Numerex. Numerex demanded that Ronsen cure such breaches or be terminated for "Cause." Ex. 109. Rather than cure the breaches, Ronsen resigned from his position at Numerex. Ex. 110. Just two days before he resigned, Ronsen again copied and removed selected e-mails that had been sent to and received from his work e-mail account, either by forwarding them to one of his non-work e-mail accounts or by copying them onto an external electronic storage device. *See* Ex. 91 (Pls.' Resps. 1, 3, 10); Ronsen Dep. 417-18, 432; Ex. 141 (Dingman Decl. ¶ 12). He then deleted all e-mails and documents off of his work laptop and Numerex's network server. *See* Ex. 91 (Pls.' Resps. 1, 10; Ronsen Dep. 417-18, Ex. 141 (Dingman Decl. ¶ 12). The day before he quit Ronsen replaced the hard drive on his laptop and took the old hard drive. *Id.* At some point, Ronsen deleted the e-mails forwarded from his Numerex account to his personal e-mail account. Ex. 91 (Pls.' Resp. 1); Ronsen Dep. 429-31, 433.

On the same day that Ronsen resigned, counsel for Rosenzweig and Naden wrote to Numerex

claiming that Numerex was in breach of *their* employment agreements and demanded more money. Ex. 111.  On June 2, 2008, Numerex's CEO advised Rosenzweig and Naden that Numerex would not alter their existing compensation arrangements.  Naden Dep. 324-25.  The pair resigned two days later, right before a long-scheduled, critical client meeting.  Ex. 112; Naden Dep. 322.  Rosenzweig testified that the resignation was voluntary.  Ex. 113 at 100.

As Ronsen had done, Rosenzweig and Naden also copied the contents of their e-mail folders and other documents onto portable storage media before resigning their positions.  Ex. 91 (Pls.' Resps. 1, 4, 10).  They took the information with them.  *Id.*

In all, Ronsen, Rosenzweig, and Naden took hundreds of thousands of pages of sensitive Division business documents prior to leaving the company.  Ronsen Dep. 369.  The information they copied was confidential and proprietary to Numerex, containing sensitive business information about Division business plans and customers.[15]  Ronsen, Rosenzweig, and Naden did not disclose to Numerex that they had taken these documents.  Ex. 141, Ex. 142.

## ARGUMENT

**I.    SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING ORBIT ONE'S CLAIM FOR BREACH OF THE APA DUE TO LACK OF "CORPORATE SUPPORT"**

Plaintiffs allege that Numerex failed to provide "corporate support" that was "promised" in the areas of "marketing, sales, human resources, and other support."  Ex. 104 ¶¶ 5, 6, 8.[16]  Plaintiffs are vague and conclusory about the actual "corporate support" that should have been delivered but was not.  They say that Numerex hired unidentified individuals without consulting with Ronsen.[17]

---

[15]    Ex. 5 (presentation of Satellite Division marketing plans); Ex. 19 (SX-1 sales prospect list); Ex. 114 (e-mail from Ronsen to president of GE Asset Intelligence, the Satellite Division's largest prospect); Ex. 115, 116 (Numerex's policies); Ex. 117 (Satellite Division's best sales prospects and leads as of March 2008); *see also* Ronsen 372-74, 376-78, 380-82.

[16]    Orbit One is the only plaintiff who is a party to the APA.  To the extent any other plaintiff purports to invoke this "breach," the claim should be dismissed for lack of privity.

[17]    Ronsen admitted on deposition that he was permitted to hire anyone he wanted to hire.  Ronsen Dep. 277.

They say that Numerex was "nonresponsive" in providing back office support. *Id.* This was a constant—if vague—theme in Ronsen's deposition testimony as well. *See, e.g.,* Ronsen Dep. 144-45, 150; 166. But Plaintiffs admitted on deposition that the contract provides no "promise" of corporate support and that they suffered no injury from any purported lack of support. Ronsen Dep. 200-05, 208; Rosenzweig Dep. 257-58. This claim should be dismissed.

### A.     The APA Does Not Promise Corporate Support

When asked to identify which contractual terms required Numerex to provide the Division with corporate support, Ronsen identified Sections 2.2.a, 2.2.e, and 2.2.f of the Earn Out, Exhibit B to the APA. Ronsen Dep. 98-100; *see also* Ex. 104 ¶ 45. But Ronsen admitted that none of these sections contains any promise of corporate support. Ronsen Dep. 98-101. Indeed, he could not have stated otherwise, as the provisions he cited make no such promise. Ex. 1, APA, Ex. B § 2.2.a, e, f. These provisions govern how various expenses would be allocated to either Numerex or the Division—not whether Numerex had an affirmative obligation to provide the Division with corporate support. Indeed, the terms "corporate support," "sales support," and "marketing support" are never even mentioned.

Ronsen himself admitted repeatedly that the APA does not promise corporate support to the Division. He stated that he "[did] not believe that in the APA there is specific language about sales support or marketing support." Ronsen Dep. 194, 99-101 (admitting that Exhibit B to the APA contains no promise that Numerex sales personnel would sell Orbit One satellite products); 116-17 (admitting that there are no representations in the APA regarding the Numerex sales team).

### B.     Orbit One Suffered No Injury Caused by Any Alleged Lack of Support     .

It is axiomatic that, to sustain an action in breach of contract, Plaintiffs must have suffered damages caused by the alleged breach. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 525 (2d Cir. 2004). Plaintiffs here have acknowledged that they suffered no injury caused

by Numerex's alleged lack of support.  In his deposition, Ronsen could not identify a single sale that

was lost as a result of the purported lack of support:

> Q.  Mr. Ronsen, let me try the question one more time.  Can you identify any sales that were
> lost; can you name a customer who you lost a sale because of the lack of support?
> A.  I cannot name a customer today, no.

Ronsen Dep. 208.

Rosenzweig and Naden both admitted that, as of June 2008, the Division could still achieve

its revenue and earnings targets:

> Q.  Now, and so you agree with me that as of June there was a possibility that the satellite
> division would make its 2008 revenue and earnings targets; correct?
> A.  Yes.

Rosenzweig Dep. 257-58.

> Q.  Sitting there in June of 2008 did you see any way that the satellite division could meet the
> earn out?
> A.  In June of 2008 there was still a chance to make the earn out, yes.

Naden Dep. 327.

If it was still possible in June 2008 for the Division to achieve its revenue and earnings

targets—and if Plaintiffs could not name a single lost customer due to the lack of "support"—then

they have suffered no injury caused by a supposed lack of support.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST RONSEN ON HIS CLAIM OF BREACH OF HIS EMPLOYMENT AGREEMENT

Ronsen's contract provided that:

> Ronsen shall serve on a full-time basis as President of NMRX's Orbit One division (the
> "Division"), with such powers and responsibilities as are customarily incident to such position
> and will diligently and competently perform such reasonable duties in connection with the
> Division's business as may be assigned to him by NMRX's Chief Executive Officer.  Mr.
> Ronsen will report to NMRX's Chief Executive Officer, and, from time to time as reasonably
> required by the business needs of the Division, to such other members of NMRX's senior
> management team as NMRX's Chief Executive Officer directs.

Ex.1, Ronsen Severance and Non-Competition Agreement ("SNC") § 1(a).  The contract goes on to

state that Ronsen could resign for "Good Reason" and defined Good Reason as:

> (i) a material breach by NMRX of any of its obligations to Mr. Ronsen under this agreement, which breach is not cured in all material respects . . . ; or (ii) a material reduction of Mr. Ronsen's duties, authority or responsibilities such that (regardless of title) he no longer has the customary duties and authority of the president of the Division (including, without limitation, authority to spend the Division's operational budget and determine the direction of the Division's business within the confines of the Division's operational budget pursuant to NMRX's processes and policies.[)].

*Id.* § 3(a).

Plaintiffs assert that Numerex breached Ronsen's SNC because Ronsen was not given his proper title and because he did not have "authority" to run the Division. *See* Ex. 104 ¶ 7. According to Plaintiffs, Ronsen was never "given the substantive role or authority of President. He was never permitted to run New Orbit or given authority to spend his budget or manage his P&L." *Id.* Plaintiffs claim that Ronsen was "relegated to position of product manager" in both duties and title. *Id.* ¶ 9. This claim is flatly contradicted by Ronsen's own testimony and documents.

### A.  Ronsen's Title Was President of the Division

Ronsen's title was to be "President of NMRX's Orbit One division (the 'Division')." Ex. 1, Ronsen SNC § 1(a). Ronsen *was* the President of the Division during his entire employment with Numerex. Ronsen Dep. 242. He held himself out as President in his correspondence with potential customers and employees—both before and after he filed a lawsuit in which he alleged that he had "never" been given the title of President.[18] Indeed, Ronsen received the *additional* title of Senior Vice President of *Numerex* in order to be able to participate in senior management meetings. Nicolaides Dep. 73.

Plaintiffs' argument that Ronsen should have been named president of "Orbit One Communications LLC" (the "LLC") is a red herring. *See* Ex. 104 ¶¶ 37, 48-53. Numerex created the

---

[18] *Compare* Compl. ¶ 9 *with, e.g.,* Ex. 118, Ex. 97, Ex. 119, Ex. 114, Ex. 120; Ronsen Dep. at 246, 247, 249, 252-53.

LLC for the sole purpose of holding assets after closing. Nicolaides Dep. 57. This structure comported with Numerex's policies and processes. Each of Numerex's operating divisions is associated with a Numerex subsidiary that holds assets. Marett Dep. 37-38. These subsidiaries do not conduct operations and have no employees—as was the case of Orbit One LLC. Nicolaides Dep. 55-56; Marett Dep. 37-38, 42-43. It is the Division that runs the operations of Orbit One, and Ronsen was President of the Division. *See, e.g.,* Ex. 114 (Ronsen wrote to an executive at General Electric in March 2008—after he commenced this lawsuit—introducing himself as "President of Orbit One."); Ex. 121.

Contrary to Ronsen's claim, the LLC and the Division were *not* the same and he knew this prior to closing. An early draft of Ronsen's SNC listed him as the President of the LLC. Ex. 122. Indeed, the draft was of a contract that would have had the LLC as Ronsen's employer. But that was *changed* before closing. The *final version* of Ronsen's contract is with *Numerex* as a party—not the LLC. Ex. 1, Ronsen SNC § 1(a). The SNC states that Ronsen is to be President of the *Division*, not the "LLC." *Id.* Lowenstein Sandler heavily negotiated these drafts, and all parties agreed to this language. Pergola Dep. 101-04.

**B.      Ronsen Had Authority as President of the Division**

Ronsen's claim that he did not have "authority" is meritless. In their Complaint, Plaintiffs run through a litany of areas in which Ronsen allegedly did not have authority as president: press releases, marketing materials, employee salaries and bonuses, hiring, acquisition of office supplies, meetings with vendors, and spending. Ex. 104 ¶¶ 43-68. Yet Ronsen's own testimony at deposition, as well as the testimony of Rosenzweig and Naden, contradicts these claims. *See, e.g.,* Ronsen Dep. 258, 277-78; Rosenzweig Dep. 235; Naden Dep. 98.

On deposition, Ronsen admitted that all Division employees reported to him. Ronsen Dep. 280; Ex. 117. He admitted that he made the final hiring decisions and that he was never prevented

from hiring or firing anyone. Ronsen Dep. 258, 277-78; *accord* Rosenzweig Dep. 235; Naden Dep. 98; Marett Dep. 166. He admitted that he set the criteria for Division employee bonuses, and that his requests to give employee raises were not denied. Ronsen at 254; *accord* Marett Dep. 234-35.

With respect to press releases, marketing materials, and office supplies, Ronsen was subject to the same processes and procedures governing everyone at Numerex, as a public company subject to federal securities laws, including Sarbanes-Oxley requirements. Nicolaides Dep. 34-35; Catherall Dep. 29. In order to comply with these laws, Numerex has in place strict policies governing the release of press and marketing materials, which are vetted and reviewed prior to public release in order to ensure that they contain verifiably true and non-misleading statements. Nicolaides Dep. 51, 168. Likewise, Numerex requires that spending be documented and subject to controls and approvals. Ronsen Dep. 276-77; Marett Dep. 98. Thus, it is true that Ronsen had to sign documentation of his purchasing decisions and that purchasing decisions over specified limits required senior Numerex management approval. But this was true for everyone at Numerex, even its CEO. Catherall Dep. 29-30; Marett Dep. 76-77. Being required to follow company-wide procedures simply does not constitute a reduction in authority. *See Stafford v. Scientia Health Group, Inc.,* 19 Misc. 3d 1145(A), 867 N.Y.S.2d 20 (Sup. Ct. N.Y. Co. 2008) (attendance reporting requirement did not constitute a diminishment of duties). Indeed, Ronsen's contract specifically *confirmed* that he would be subject to "NMRX processes and policies," Ex. 1, Ronsen SNC § 3(a), and Ronsen testified that he received copies of many such policies. Ronsen Dep. 274. Ronsen admitted that none of his expenditure requests was ever denied. Ronsen Dep. 279.

Ronsen had the power to settle legal disputes threatening the business of the Division. When the depth of the dispute with Axonn became known to Numerex—disclosed by Axonn after the closing—Numerex's CEO and general counsel sat down with Axonn to try to work out a settlement.

DiBella Dep. 97, 103, 153-54. Yet Ronsen completely rewrote the terms proffered by Axonn. DiBella Dep. 103; Ex. 59. It was perfectly clear to Axonn that any deal could not proceed without Ronsen's approval—which was not forthcoming. DiBella Dep. 103-04, 105; Ex. 55.

Ronsen alleges that his authority was usurped because other individuals—Louis Fienberg and Mike Marett—purportedly ran the business. Ex. 104 ¶¶ 64-68. Both Mr. Fienberg and Mr. Marett are senior Numerex executives. Nicolaides Dep. 98. Pursuant to Ronsen's SNC, he was required to report "to such other members of NMRX's senior management team as NMRX's Chief Executive Office direct[ed]," including Mr. Fienberg, Numerex's then-Senior Vice President of Corporate Development, and Mr. Marett, Numerex's Chief Operating Officer. Nicolaides Dep. 88, 104; Marett Dep. 12; see Ex. 1, Ronsen SNC § 1(a).

Ronsen complains that Marett was named President of the LLC. Ex. 104. But, as shown above, the LLC was *different* than the "Division." As Marett himself explained, the LLC did not conduct operations; it held contracts and other assets. Marett Dep. 37-38, 42. Indeed, Marett testified that he could not decline to sign a contract that Ronsen negotiated. Marett Dep. 43. As for Fienberg, he was Numerex's Vice President of Corporate Development and an integral part of the transition team, to whom Ronsen would turn for integration support and queries: it was Fienberg's job to ensure the transition went smoothly and to be there when Ronsen needed him. Nicolaides Dep. 100, 104. Far from *usurping* his authority, these senior managers attempted to provide guidance and respond to Ronsen's complaints. Marett Dep. 21, 22, 27, 49, 50; Nicolaides Dep. 109.

## III.    SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST ORBIT ONE AND RONSEN ON THEIR DECLARATORY JUDGMENT CLAIM BECAUSE RONSEN DID NOT HAVE "GOOD REASON" TO RESIGN

Shortly after Numerex sent Ronsen its April 5, 2008 notice to cure, Ronsen resigned. Ex. 110. Ronsen did not state the reason for his resignation, other than to make a general allegation of

breach of contract. *Id.* Plaintiffs' desire to invoke the "Good Reason" clause is transparent. Under

Ronsen's SNC, such a termination has a draconian consequence: Orbit One "shall be deemed to have

earned the NMRX Stock . . . as well as the cash consideration specified in [the Earn Out provisions]

of the Asset Purchase Agreement." Ex. 1, Ronsen SNC § 3(c).

> The evidence does not support the windfall that Plaintiffs seek. Plaintiffs cannot prove either:

> (a) "a material breach by NMRX of any of its obligations to Mr. Ronsen under this
> Agreement" (the SNC) or (b) ("a material reduction of Mr. Ronsen's duties, authority
> or responsibilities such that (regardless of title) he no longer has the customary duties
> and authority of the president of the Division (including, without limitation, authority
> to spend the Division's operational budget and determine the direction of the
> Division's business within the confines of the Division's operational budget pursuant
> to NMRX's processes and policies.") *Id.* § 3(a).

## A.    There Was No "Material Reduction" of Ronsen's Duties or Authority

Ronsen did not experience a "material reduction" in his "duties, authority or responsibilities."

Ronsen has admitted that, from virtually the first day of his employment, he was unhappy with the

level of supervision and process to which he was required to submit. Ronsen Dep. 270. This is not a

*reduction* of duties or authority. It is a free-floating dissatisfaction with life inside a corporation.

As Ronsen admitted, he remained empowered to hire and fire the Division's employees; he

had the power to direct his subordinates; no one in the Division circumvented his authority by going

straight to the CEO or other senior management; and senior management never denied any purchase

requisition he made. Ronsen Dep. 254, 258, 277-78, 279-80.

In order to demonstrate a material reduction in duties or responsibility, a plaintiff must

demonstrate that he or she was stripped of "the things that determined [his or her] identity" within the

corporation. *Harden v. Warner Amex Cable Commc'ns, Inc.*, 642 F. Supp. 1080, 1095 (S.D.N.Y.

1986) (quoting *Marks v. Cowdin*, 226 N.Y. 138, 146-47 (1919)). *See, e.g., Karas v. H.R. Labs., Inc.*,

271 A.D. 530, 540, 67 N.Y.S.2d 15, 18-19 (2d Dep't 1946) (material reduction where duties as

department head "virtually taken" and "turned over to" someone else.); *see also Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 12 (1972) (plaintiffs' purported subordinate ran and supervised company); *Hondares v. TSS-Seedman's Stores, Inc.*, 151 A.D. 2d 411, 413, 543 N.Y.S. 2d 442, 442 (1st Dep't 1989) (lines of authority and reporting responsibility changed).   Nothing like that happened in this case.

### B.    Ronsen Did Not Have "Good Reason" Based on Numerex's Setoff

Numerex exercised its setoff rights on March 27, 2008.  Ex. 108.  Mr. Ronsen resigned less than one month later, claiming "Good Reason."  Ex. 110.  The setoff could not be a "Good Reason" for termination, for two reasons.  *First*, the exercise of a setoff under the APA is not a breach of the APA; it is a right expressly granted in the APA.  Ex. 1, APA § 7.8.

*Second*, Plaintiffs' theory rests on their assertion that the APA and Ronsen's SNC are effectively "a single agreement."  Ex. 123 at 4, 29-31.  But Plaintiffs' "one contract" theory is inconsistent with the documents.  Indeed, as described below, Orbit One's deal counsel (a member of the Lowenstein Sandler firm) admitted on deposition that the documents were expressly intended and specifically structured so that a non-payment under the APA ***was not*** a breach of the Ronsen's SNC. *See* Pergola Dep. 133.  This was done, according to Orbit One's counsel, in order to preserve favorable tax treatment for Ronsen.  Pergola Dep. 131; 133.

### 1.    The APA Preserved Numerex's Setoff Rights

Numerex was entitled to exercise a setoff under the APA.  In its counterclaim and in its March 27, 2008 letter, Numerex invoked the APA's indemnity running to it from Orbit One with regard to Axonn and the personal guaranty executed by Ronsen, Rosenzweig, and Naden in support of the indemnity.  *See* Ex. 1, APA Ex. I, APA § 7.2(f) (indemnification by Orbit One and referring to matters referenced in Schedule 3.3(1)).  Numerex also exercised its common law setoff rights as a

result of its counterclaims for breach of fiduciary duty and breach of contract.[19]

Section 7.8 of the APA provides:

**Offset Under Escrow Agreement.** The Buyer, may, but shall not be required to, offset any amounts otherwise payable pursuant to the Escrow Agreement against any amounts payable or reimbursable by the Seller to the Buyer under this Agreement, including any indemnifiable damages sustained by any Buyer Indemnified Party.

Ex. 1, APA § 7.8.

Indeed, in order to obtain the benefit of the Guaranty, Numerex is required first to seek

recourse against Orbit One from the common stock or cash escrow held by the Escrow Agent. *Id.,*

Guaranty at 1. The Guaranty provides, in part:

The Guarantors [Ronsen, Rosenzweig and Naden] hereby guaranty to and for the benefit of [Numerex] the payment in full when due of Orbit One Communications, Inc.'s obligations to indemnify [Numerex], for undisclosed Liabilities in breach of Section 3.8 of the Asset Purchase Agreement, as well as the indemnity obligations specified in Section 7.2 (e) and (f) of the Asset Purchase Agreement, provided however, that: 1) . . . [Numerex] will first seek recourse against Orbit One Communications, Inc. from the NMRX Common Stock and/or the Cash Escrow held by Escrow Agent . . . .

*Id.,* APA Ex. I.[20]

When shown these documents, Ronsen admitted that Numerex was entitled—nay, required—

to exercise the setoff:

Q. [W]hat would [Numerex] do in order to seek recourse against the escrowed shares?
A. According to 7.8 offset.
Q. And that would be something that they would be doing in furtherance of their rights and

---

[19] The common law right of setoff is well-settled. It provides "a legal ground upon which a party can postpone paying a sum to another party until the net liability between the parties is finally determined." *Ferguson v. Lion Holding, Inc.,* 312 F. Supp. 2d 484, 503 (S.D.N.Y. 2004). "A right of offset belongs 'to every creditor, to apply the appropriated monies of his debtor, in his hands, in extinguishment of the debts due him.'" *Boers v. United States,* 44 Fed. Cl. 725, 733 (Fed. Ct. Cl. 1999) (quoting *United States v. Munsey Trust Co.,* 332 U.S. 234, 239 (1947)).

[20] The Escrow Agreement also contemplated that the escrowed cash and stock would be held pending resolution of any dispute:

If any dispute shall arise with respect to the delivery, ownership, right of possession or disposition of the NMRX Stock and/or the Cash Escrow . . . the Escrow Agent shall be authorized, without liability to anyone, to (i) refrain from taking any action other than to continue to hold the NMRX Stock and the Cash Escrow pending receipt of a Joint Instruction from Numerex, OOC and [ORBIT ONE] . . . .

See Ex. 1, APA Exhibit A, § 4.2(a).

obligations under the APA and the guarantee; isn't that right?   . . . Assuming they had a claim. . . .

A.  That would be something that –

Q.  That they would be doing in furtherance of their rights and responsibilities under the asset purchase agreement and the guarantee? . . .

A.  Yes, if they are a claim [sic]. . . .

Q.  And that would not be a breach of the APA, it would be something that they would be required to do in order to enforce the guarantee; isn't that right? . . .

A.  Assuming there was a claim.

Q.  And so the answer is yes assuming that they had made a claim? . . .

A.  Yes.

Ronsen Dep. 304-06.

## 2.     A Breach of the APA Is Not a Breach of the SNC

Even if Numerex had breached the APA—and the foregoing demonstrates that it did not—a breach of the APA would not have been "Good Reason" to terminate the SNC. That contract's "Entire Understanding" clause expressly *excludes* the APA from being part of it. Ex. 1, SNC § 11. The APA is not an exhibit to the SNC. Similarly, the APA has *its own* merger clause, another indication that the two agreements are not "all in one" as Plaintiffs claim. Ex. 1, APA § 9.3. *See In re Adelphia Business Solutions, Inc.*, 322 B.R. 51, 60 (Bankr. S.D.N.Y. 2005) ("the existence of integration [*i.e.*, merger] clauses in *both* Leases here is a strong indication that the documents memorialize the parties' final intent to create distinct contracts")(footnote omitted).

Orbit One's deal counsel, Anthony Pergola of Lowenstein Sandler, confirmed that the parties expressly intended two separate contracts and did not want any potential breach of the APA to trigger compensation under the SNC:

A.  My recollection is the parties did not want the asset purchase agreement referenced in the Exhibit D severance agreement.

Q.  And why is that?

A.  For tax and accounting reasons . . . the tax treatment was better for Ronsen . . . . The conclusion was reached that the asset purchase agreement was not referenced in the entire understanding clause.

Q.  And, therefore, the consequence of that, according to the parties' agreement, was that a breach or default under the asset purchase agreement would not trigger rights under the severance and noncompetition agreement, correct? . . .

A.  Rights under the noncompetition agreement?  If what you're asking is whether a default

31

under the asset purchase agreement was referenced in the severance agreement as a trigger for default under the severance agreement, my recollection – refreshed by reviewing it with you today – is **_no, it was not referenced as a default_**.

Q. Thank you.  And just to be clear, that was a decision that the parties made together guided by their tax advisors and their accounting advisors, correct? . . .

A. That's my recollection.

Pergola Dep. 131-34 (emphasis supplied).  The parties' considerations are important in confirming that the SNC and APA were separate agreements and that, as Orbit One's counsel testified, a default under the Asset Purchase Agreement "was not referenced as a default" under the SNC.  *See, e.g. G.K. Alan Assoc., Inc. v. Lazzari*, 44 A.D.3d 95, 103, 840 N.Y.S.2d 378 (2d Dep't 2007) (income tax effect parties sought by structuring asset purchase agreement and consulting agreement was relevant in determining whether agreements were separate).  In light of the admissions by Orbit One' s deal counsel at Lowenstein Sandler, the arguments by litigation counsel at the same firm should be summarily dismissed.

## IV.   PLAINTIFFS' CLAIMS OF UNJUST ENRICHMENT AND BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING SHOULD BE DISMISSED

Plaintiffs' unjust enrichment claim should be dismissed because a valid contract exists between the parties that sets forth and provides for all of their rights and obligations related to the acquisition.  "[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [*i.e.*, unjust enrichment] for events arising out of the same subject matter."  *MacDraw, Inc. v. The CIT Group Equipment Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998) (internal quotation marks and citations omitted); *In re First Cent. Fin. Corp.*, 377 F.3d 209, 213 (2d Cir. 2004) ("[T]he existence of a written agreement precludes a finding of unjust enrichment.").  Here, because Plaintiffs' unjust enrichment claim arises out of the exact subject matter governed by their contract with Numerex, the unjust enrichment claim must be dismissed.

Likewise, Plaintiffs' claim of breach of the implied covenant of good faith and fair dealing

should be dismissed as duplicative of their breach of contract claim. "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Hall v. Earthlink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005) (citations omitted); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled."). Here, Plaintiffs' claim of breach of the covenant of good faith and fair dealing does no more than re-style its breach of contract claim using the exact same facts and, therefore, must also be dismissed.

## V.   PLAINTIFFS FRAUDULENTLY INDUCED THE APA AND MATERIALLY BREACHED IT EXCUSING NUMEREX FROM FURTHER PERFORMANCE

Performance is excused when the other party to a contract has committed a fraud or a prior material breach. *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). If a party breaches "one or more warranties and the cumulative effect of such breaches was material, it did not substantially perform its side of the deal." *Allegheny*, 500 F.3d at 186.

As set forth in detail below, Plaintiffs breached express warranties in the APA and fraudulently induced the contract. This relieved Numerex of any further performance under the contract. *See LaSalle Bank Nat'l Ass'n v. Capco Am. Securitization Corp.*, 2006 WL 177169, at **2-3 (S.D.N.Y. Jan. 25, 2006).

## VI.   NUMEREX SHOULD RECEIVE SUMMARY JUDGMENT ON LIABILITY FOR BREACH OF WARRANTIES AND REPRESENTATIONS

"A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely." *Ainger v. Mich. Gen'l Corp.*, 476 F. Supp. 1209, 1220 (S.D.N.Y. 1979)

(quoting Judge Learned Hand in *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946)); *Allegheny*, 500 F.3d at 184-85. The contractual warranty is "intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Id.*; at 181 (citation omitted) *see also CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 503, 554 N.Y.S.2d 449, 452-53 (1990).

### A.    Orbit One Breached Representations and Warranties Relating to Axonn

#### 1.    Orbit One Breached the No Litigation Warranty

Section 3.15 of the APA represented and warranted that "[e]xcept as set forth on Schedule 3.15, no litigation . . . is pending or, to the knowledge of Seller, threatened, against Seller, the Business or any of the Assets . . . ." Schedule 3.15 refers to "disclosure of Axonn Matters on Schedule 3.3(1)." Ex. 1, Schedule 3.15.

That schedule contains material omissions. Schedule 3.3(1) sets forth a "chronology" of material events, starting with a reference to the Continuity of Supply Agreement between Orbit One and Axonn. This description follows:

- Naden leaves Axonn and becomes an employee of Seller - May 2006.
- Axonn delivers letters to Naden and Seller alleging that Naden breached confidentiality obligations to Axonn. Seller and Naden, in consultation with legal counsel, respond and deny any wrongdoing - June 2006.
- Further correspondence is exchanged in the subsequent two months, and no legal action results.
- Axonn and Seller enter into Second Amendment - November 2006.
- Axonn and Seller are currently negotiating the grant of additional license rights.

*Id.*, Schedule 3.3(1). The juxtaposition of these events is misleading because, according to Naden, the amendment to the Continuity of Supply Agreement and negotiations over license rights were unrelated to the trade secret issues Axonn had threatened litigation over. Naden Dep. 236, 239-40, 242-43. By listing the events in this manner, the schedule implies that continued business dealings or license negotiations resolved Axonn's threat, or constituted evidence that the threat was

no longer an issue after November 2006.  In reality, Naden admitted that the Continuity of Supply

Agreements and continued negotiations over license rights did not in any way resolve Axonn's

threats.  *Id.* at 236.

Additionally, although Schedule 3.3(1) states that "the relationship remains strained," the

schedule fails to disclose that Axonn's litigation threat continued to be a live issue through closing.

Throughout negotiations—indeed up to the eve of closing—Axonn threatened legal action against

Orbit One and Naden.  The following threats from Axonn were not disclosed in Schedule 3.3(1)'s

purported "chronology":

- In February 2007, Ronsen received correspondence from Axonn that he called a renewed "threat of legal action" and a "probable deal killer." Ex. 30.  Rosenzweig also referred to Axonn's "continuing and repeated threat of legal action" and Axonn's "latest legal threat." Ex. 31.  Axonn accused Naden of admitting that he and Orbit One were using Axonn's proprietary information to "design around" Axonn's confidential patent application in the development of the SX-1.[21]

- In May 2007, Axonn shipped 10,000 STX units to Orbit One, but under a reservation of rights. Ex. 42, Ex. 43, Ex. 44.  Axonn wanted "Orbit One [to] understand and acknowledge that Axonn's shipment of STXs to Orbit One does not resolve the confidential information matter" (which arose <u>after</u> November 2006) and did not provide a license. Ex. 43.

- On June 18, 2007, Axonn accused Ronsen of reneging on the oral agreement they had reached in March to resolve the "serious issue" of confidential information breaches by Naden, declaring that Ronsen had "purposefully departed from it." *Id.*  Axonn terminated discussions. *Id.*  Naden wrote that the situation "probably can't get worse." Ex. 48.

- On the eve of closing, July 31, 2007, Axonn wrote to Ronsen, again accusing that Naden "use[d] Axonn confidential information and trade secrets." Ex. 50.  Axonn threatened that this issue was a "very serious issue" that was "not going away by itself," and that "[i]t is up to you as to whether you want to take another shot at resolving this through an agreement." *Id.*  Orbit One's deal counsel at Lowenstein Sandler testified that he had not seen this e-mail, and that he would have remembered it if he had because there was "[v]ery strong language" in it. Pergola Dep. 200-01.  Naden himself admitted that the e-mail was "a piece of relevant documentation that is necessary for Numerex to understand. . ." Naden Dep. 298.

---

[21]    DiBella 38, 41, 42, 43-46, 55-56; *see* Exs. 32 and 33.

These facts were not disclosed in Schedule 3.3(1).  Ex. 1, Schedule 3.3(1).

### 2.      Orbit One Breached the Intellectual Property Warranty

In section 3.21(g) of the APA, Orbit One warranted that:

> No use of any product or service offered or sold by Seller breaches, has violated or conflicted with or violates or conflicts with any license . . . of Seller with any person . . . .  Seller has received no notice (whether in the form of invitation to license or otherwise) from any person that . . . the Use of any product . . . sold by Seller, or the conduct of the Business, has infringed or misappropriated or does or will infringe or misappropriate any common law or statutory rights of any other person or entity, nor is there any basis for any such assertion. Except as set forth [in] Schedule 3.21(g), there is no pending or threatened claim . . . contesting or challenging the ownership of or the validity or enforceability of, or Seller's right to Use, any Seller Intellectual Property nor is there any basis for any such claim, litigation or proceeding.

Schedule 3.21(g) refers to "Axonn Matters on Schedule 3.3."  Ex. 1, Schedule 3.21(g).

Schedule 3.3(1) failed to disclose that Axonn accused Naden in February 2007 of admitting

that he and Orbit One were using Axonn's proprietary technical information to "design around"

Axonn's confidential patent application in developing the SX-1.[22]  While Axonn continued to accept

Orbit One's orders for its STX product, it did so only under a reservation of rights—which was not

disclosed in Schedule 3.3(1).  Ex. 112, Ex. 44.

Plaintiffs' failure to disclose Axonn's accusations of trade secret infringement and its

reservation of rights concerning infringement breached the Intellectual Property warranty in Section

3.21 of the APA.  The breach went to the very heart of the transaction, as Axonn's claims threatened

the integrity of the SX-1.  By claiming that the STX product was designed dishonestly, Axonn

threatened the product's post-closing success.  This claim should have been included on Schedule

3.3(1).

### 3.      Orbit One Breached the Full Disclosure Warranty

Section 3.33 of the APA states that:

---

[22]     DiBella Dep. 38, 41, 42, 43-46, 55-56; *see* Exs. 32 and 33.

[n]o representation or warranty by Seller in this Agreement contains any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or necessary to make any statement herein or therein not misleading provided that as used in this Section 3.33 the term "material fact" must relate "to the Business as a whole" as further defined in Section 7.2(d).[23]

Ex. 1, APA § 3.3. As described above, Schedule 3.3(1) of the APA was written to suggest that Axonn's threat of litigation had ceased, despite the fact that a threat of litigation from Axonn had not subsided at all, and did not disclose Axonn's position that the SX-1 was using unlicensed technology. *See* § VI.A.1, 2 *supra*. Plaintiffs' omission in Schedule 3.3(1) rendered the Schedule materially misleading, in breach of the warranty of full disclosure in section 3.33.

### B. Orbit One Expressly Indemnified Numerex for Any Breaches of the Express Representations and Warranties in the APA

Section 7.2 of the APA indemnifies Numerex for any breaches of the representations and warranties in the APA. *See, e.g.*, § 7.2(f) (Indemnity for "the matters referenced in Schedule 3.3(1)"). Ronsen, Rosenzweig, and Naden personally guaranteed this obligation. Ex. 1, APA Ex. I.

## VII. PLAINTIFFS FRAUDULENTLY INDUCED NUMEREX TO ENTER INTO THE TRANSACTION

### A. Plaintiffs Omitted Material Facts

"[O]missions of material fact may rise to a level of constituting fraud" if a duty to disclose exists. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984) (citations omitted). Parties to a transaction have a duty to disclose where a "party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth." *Brass v. American Film Techs, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Junius Constr. Corp. v. Cohen*, 257 N.Y. 393, 400, 178 N.E. 672 (1931) (Cardozo, J.)). "Half-truths can actually be regarded as crossing the line from non-disclosure

---

[23]    Section 7.2(d) defines a breach that is "material to the Business as a whole" to mean "related to Losses in excess of $250,000 in the aggregate."

to an active false assertion of fact." *Morgan Guaranty Trust Co. of N.Y. v. Republic of Palau*, 657 F.

Supp. 1475, 1483 (S.D.N.Y. 1987).

Plaintiffs provided Numerex with half-truths about the Axonn dispute, both in Schedule

3.3(1) and in the disclosures they provided to Numerex throughout negotiations. Ex. 25. Plaintiffs

had a duty to disclose the full story of the Axonn dispute and their business customer relationships.

*See Brass*, 987 F.2d at 150. As described above, Ronsen, Rosenzweig, and Naden did not disclose

Axonn's February 2007 litigation threats, the March 2007 settlement discussions in Covington,

Axonn's May 2007 reservation of rights, Axonn's June 18, 2007 e-mail terminating settlement

discussions, or Axonn's July 31, 2007 e-mail again threatening litigation, nor the hurricane-

dependence of their forecasts.[24] Plaintiffs also failed to disclose that their business plan and forecast

was dependent on a hurricane hitting the United States. Catherall Dep. 357-60. They failed to

disclose the information they had that FEMA was projecting "no sale[s] of new trackers," Ex. 18, and

that their potential customers had very little prospect of buying the product. Ex. 19, Ronsen Dep. 88-

90. Ronsen, Rosenzweig, and Naden had a duty to disclose these material facts. *See Brass*, 987 F.2d

at 150. They chose not to.

## B. Plaintiffs Acted with the Requisite Scienter

In order to demonstrate scienter, a plaintiff must present strong circumstantial evidence of

conscious misbehavior or recklessness or establish motive and opportunity to commit fraud.

*Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 454 (S.D.N.Y. 2007) (quoting

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006)); *see also Cofacredit, S.A. v. Windsor*

*Plumbing Supply Co.*, 187 F.3d 229, 241 (2d Cir. 1999). No direct evidence of scienter is required

because "fraudulent intent is rarely susceptible to direct proof and must ordinarily be established by

---

[24] *See* Ex. 30, Ex. 36, Ex. 42, Ex. 43, Ex. 44, Ex. 47, Ex. 50, Ex. 124; Fienberg Dep. 34-35.

circumstantial evidence and the legitimate inference arising therefrom." *Watts v. Jackson Hewitt Tax Service Inc.*, 579 F. Supp. 2d 334, 352 (E.D.N.Y. 2008) (citation omitted).

### 1.   Circumstantial Evidence of Conscious or Reckless Behavior

"Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (citation and footnote omitted). Plaintiffs' conduct was, at the very minimum, reckless.

When Axonn renewed its litigation threat in February 2007, the month in which Numerex and Orbit One began negotiating the transaction, Ronsen immediately recognized the impact that Axonn's legal threats could have on a potential merger with Numerex. The day after Numerex sent Ronsen a draft Letter of Intent, Ronsen wrote to a third party to "vent our frustrations." Ex. 12 and Ex. 30. Ronsen continued, "[a]t this time, we have only one primary concern which remains unresolved: the threat of legal action which [Axonn] agreed to rescind last summer but still has not." Ex. 30. Ronsen then stated that "[o]ur current position is such that we're obliged to reveal a potential legal action from a primary component vendor during due diligence. . . **a probable deal killer**." *Id.* (emphasis added). Later, in response to an e-mail from Naden regarding disputed patent issues, Ronsen wrote that "**this is of the absolute highest significance to our future existence as a company**. . . ." Ex. 34 (emphasis added).

Yet Ronsen affirmatively represented to Orbit One's auditors that "there is no pending or threatened litigation against Orbit One at this time," when he knew his statement was false and would be incorporated into the assumptions underlying audited financial statements that would become a part of the APA. *See* Ex. 49. In response to Numerex's request for more documentation on the

Axonn matter, so as to "make sure we have everything," Ronsen did not disclose everything. Ex. 25. Indeed, on June 22, Naden again sent the April 23 "no litigation" letter from Axonn, without disclosing the various correspondence threatening litigation. Ex. 41, Ex. 125. As late as July 19, 2007, Naden represented to attorney Scott Petty, [conducting Axonn due diligence,] that, "no further claims had been discussed with Axonn." Petty Decl. ¶ 3(2). And on July 31, Ronsen hid yet another Axonn threat, in which DiBella wrote, "[i]f Stratton were to specifically ask me if there are any issues outstanding between Axonn and Orbit One, the answer would have to be yes." Ex. 50. Ronsen's response was telling: he forwarded the e-mail to the other principals of Orbit One and warned them to keep it "CONFIDENTIAL." Id.

Plaintiffs also misled Numerex about Orbit One's business prospects. Ronsen admitted on deposition that their projections were based on "predicted hurricane activity," which he never disclosed to Numerex. Ronsen Dep. 146. Ronsen further admitted that he disregarded information indicating that FEMA would curtail its tracker purchases, and he did not investigate whether their projections should accordingly be revised. Rosenzweig 121; Ex.18. Understandably, Plaintiffs' only concern just before closing was "not hitting the numbers." Rosenzweig Dep. 112-13; Ex. 20. They acknowledged among themselves that it was "likely" that they would miss their numbers "at some point" in the next two years by "20% or 25% . . . for two consecutive quarters," but never disclosed these concerns to Numerex. Ex. 21; Fienberg Dep. 34, Catherall Dep. 358-59.

### 2.      Motive and Opportunity

Scienter may also be shown through "a motive for committing fraud and a clear opportunity for doing so." *Cofacredit, S.A.*, 187 F.3d at 241. Plaintiffs had both motive and opportunity. Their motive was to close a multi-million dollar transaction that would benefit them. Ronsen admitted that disclosure of the Axonn threats would be a "probable deal killer." Ex. 30. So instead, Plaintiffs took

the opportunity to hide the truth not only from Numerex but from their own auditors and from their own deal counsel. *See* Ex. 49; Pergola Dep. 200-01. When Orbit One's deal counsel at Lowenstein Sandler was confronted in deposition with the e-mails reflecting ongoing disputes with Axonn through closing, he admitted repeatedly that he could see how "Numerex would feel misled" because the e-mails were never disclosed to Numerex. Pergola Dep. 193-94, 202, 203-06.

There is no dispute that Plaintiffs hid the truth. The question is why. The answer—as Rosenzweig admitted in notes he took just before the deal closed—is obvious: "this [is] about Dave and greed." Ex. 20.

### C.    Numerex Relied on Plaintiffs' Representations and Suffered Injury

Numerex had the right to rely on the representations and warranties made in the APA. *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F. Supp. 2d 349, 373 (S.D.N.Y. 2007) (Kaplan, J.) ("where the 'representations were made to' a party to a contract, 'he or she alone ha[s] the right to rely upon them',") (citations omitted); *see also Allegheny,* 500 F.3d at 181 (finding that the warranties in the contract "imposed a duty on [plaintiff] to provide accurate and adequate facts and entitled [defendant] to rely on them without further investigation or sleuthing"). Indeed, the purpose of a warranty is "precisely to relieve the promisee of any duty to ascertain the fact for himself . . . ." *Metropolitan Coal,* 155 F.2d at 784. "To argue that the promisee is responsible for failing independently to confirm it, is utterly to misconceive [the] office "of a warranty." *Id.* Numerex, therefore, was entirely justified in its reliance on Schedule 3.3(1) of the APA, which, as described above, did not disclose a live threat of litigation from Axonn.

Numerex also justifiably relied on the reckless forecasts. As Numerex CFO Alan Catherall testified, Plaintiffs were satellite industry experts. Catherall Dep. 75, 107. Numerex suffered injury, as it would not have entered into the transaction, had it known about Axonn's continuing threat of

litigation, Nicolaides Dep. 228-34 (Prelim.) and because it overpaid based on the reckless forecast. *See* Catherall Dep. 238, 243-44.

## VIII.   RONSEN, ROSENZWEIG, AND NADEN BREACHED FIDUCIARY DUTIES

Employees have an "'affirmative duty at all times to act in [their] employer's best interests,'" *id.*, and with the "'utmost good faith and loyalty'" in the performance of their duties. *Phansalkar v. Anderson Weinroth & Co.*, 344 F.3d 184, 200 (2d Cir. 2003) (citation omitted). Courts have enforced this standard "with 'uncompromising rigidity.'" *Blue Chip Emerald LLC v. Allied Partners Inc.*, 299 A.D.2d 278, 279, 750 N.Y.S.2d 291, 294 (1st Dep't 2002) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928)); *see also Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006); *Maritime Fish Prods. V. World-Wide Fish Prods.*, 100 A.D.2d 81, 87-88, 472 N.Y.S.2d 281, 285 (1st Dep't 1984).

Plaintiffs repeatedly stated that their interests were not aligned with those of Numerex because of the contingent Earn Out structure - which was a fundamental part of the APA. Ronsen wrote in December that "our interests are simply not aligned . . ." and that the Earn Out generated a "serious conflict of interests" and "[p]ut[] us materially at odds with NMRX-centric goals (examples: Selling T3 at loss to reach revenue goals while sacrificing profit)." Ex. 126, Ex. 127, Ex. 128, Ex. 118. Rosenzweig agreed, writing that "[t]he Earn-Out generates the conflict for us" and "is an obstacle to our ability to align our two company's goals." Ex. 129.

It is well established that "when a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make 'full disclosure' of all material facts." *Blue Chip Emerald LLC*, 299 A.D.2d at 279, 750 N.Y.S.2d at 294 (citation omitted) 557, 571, 483 N.Y.S.2d 667,675 (1984); *Alpert v. Williams St. Corp.*, 63 N.Y.2d ("the courts must look for complete and candid disclosure of

42

all the material facts and circumstances"). Indeed, the duty is to "not obtain any interest adverse to" the principal, "at least without making full disclosure . . . of any such interest." *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmB H & Co.* , 782 F. Supp. 763, 776 (W.D.N.Y. 1991) (citation omitted). A fiduciary also has a "duty not to secure personal gain from [a] transaction with his principal." *Landau v. Percacciolo*, 50 N.Y.2d 430, 436-37, 429 N.Y.S. 2d 566, 569 (1980).

Plaintiffs here failed to meet this duty in three respects.

### A.    Ronsen, Rosenzweig, and Naden Schemed to Concoct Evidence against Numerex

Ronsen, Rosenzweig, and Naden concocted evidence and allegations to support a "Good Reason" termination by Ronsen, knowing that those allegations were false. They did so to benefit themselves since, under Ronsen's SNC, a "Good Reason" termination entitles Orbit One (and, indirectly, Ronsen, Rosenzweig, and Naden as Orbit One shareholders) to the Earn Out payments regardless of the Division's performance. Ex. 1, Ronsen SNC § 3(c).

At the end of September 2007—after having sold just eleven SX-1 units in the two months following the closing, against their projection of 3,050 units—Ronsen, Rosenzweig, and Naden began drafting a letter to Numerex senior management in an attempt to blame the poor performance of the Division on Numerex. Ex. 130, Ex. 131, Ex. 132, Ex. 133. They did not mention in the letter that the forecast had depended on the occurrence of a major hurricane. *See id.* Rather, they concocted another story, claiming that Ronsen lacked authority and that Numerex failed to provide support it had purportedly promised to Orbit One. Ex. 63. The language in the letter deliberately tracked the "Good Reason" termination language in Ronsen's SNC. *Compare* Ex. 1, Ronsen SNC § 3(a) *with* Ex. 63.

In drafting the October 5 letter, Ronsen, Rosenzweig, and Naden took advantage of their positions as Numerex executives to encourage and solicit complaints from their subordinates in the

Division, which they used in their letter. The letter included a litany of complaints, spanning two-and-one-half pages, that Ronsen admitted he had "collected from some of my staff." Ex. 63. Indeed, Ronsen held a meeting for all Satellite Division employees to gather a list of "issues" they were having with Numerex. Stephen Black Decl. (April 2008) ¶ 3. In this way, Ronsen, Rosenzweig, and Naden began poisoning the relationship between Division employees and Numerex senior management in order to further their own economic interests at the expense of Numerex.

The Division under Ronsen's leadership continued its abysmal performance, selling just eleven SX-1 units during the final quarter of 2007 against a forecast of 5,150. Ex, 141 (Catherall Decl. ¶ 4). In December, Ronsen drafted another letter to senior Numerex management, this time with the assistance of Lowenstein Sandler, again blaming Numerex for the Division's performance. Ex. 134. Ronsen circulated a draft of the letter to Rosenzweig and Naden, asking for their response "so I can get this to attorneys." Ex. 135. Two hours later, Rosenzweig responded, attaching an extensive mark-up of the draft letter. Ex. 135. In Rosenzweig's e-mail response, he admitted that their interests were not aligned with those of Numerex: "the earn-out itself is an obstacle to our ability to align our two company's goals, so we should find a way to change or eliminate it such that it does not drive us to act against our own or Numerex'[s] daily, monthly, annual or long term goals." Ex. 135.

Even after initiating his lawsuit on January 8, 2008, Ronsen continued fabricating evidence against Numerex. For example, he drafted an e-mail for one of his subordinates complaining about changes to employee health benefits, for the subordinate to send to Numerex's benefits coordinator. Ex. 136. The e-mail Ronsen proposed invoked a challenge to the authority behind the health benefits changes: "Would you please tell me who authorized these changes?" *Id.* Unsurprisingly, this "authority" issue is one of the central themes of Ronsen's lawsuit against Numerex.

Indeed, Ronsen, Rosenzweig, and Naden had an eye toward litigation all along.  In planning a response to an e-mail from Numerex's CEO, Naden e-mailed Ronsen his suggested response and then asked, "how does this message play in court?"  Ex. 137.  Far from serving their employer's interests, Ronsen, Rosenzweig, and Naden advanced their own to Numerex's detriment in breach of their fiduciary obligations to Numerex.

### B.      Stealing Evidence

Employees breach their fiduciary duties by misappropriating their employer's property.  *See Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1017 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996).  As of August 1, 2007, information residing on Numerex's servers and employee laptops was Numerex's property.  Ex. 1, APA § 1.1(a)(i), (a)(ii), (a)(x); Ex. 138 at 22, Ex. 139.  *See Kaufman v. SunGard Invest. Sys.*, 2006 WL 1307882, No. Civ. A 05-CV-1236, at *3 (D.N.J. May 10, 2006).  By their own admissions, Ronsen, Rosenzweig, and Naden copied, took, and destroyed Division documents and property both before and after Orbit One and Ronsen filed their lawsuit against Numerex.[25]

In all, Ronsen, Rosenzweig, and Naden took hundreds of thousands of pages of Division documents.  Ronsen Dep. 369-70.  This breach is particularly egregious in view of the fact that Ronsen admitted that they were "consider[ing] competing with Numerex."  Ronsen Dep. 405.

### C.      Self-Dealing in Connection with the Stratix Renewal

As noted above, Stratix was the Division's largest customer.  Ronsen Dep. 48.  At the end of December 2007, Ronsen, Rosenzweig, and Naden engaged in a subterfuge in order to obtain a $1.75 million payment for Orbit One based on the renewal of its contract with Stratix.  Schedule 1.3(a)(iii) of the APA provides for a cash payment to Orbit One upon extension of the Stratix contract "on

---

[25]      Ex.91 (Pls.' Resps. 1, 3, 4, 10), 503 ¶¶ 4, 8, 12, 15; Ronsen Dep. 372-74, 376-78, 380-84, 387-89, 409-418, 427-31, 433.

similar terms, conditions, economics and quantity" as the original contract.  Ex.1, Schedule

1.3(a)(iii).  Under the terms of Schedule 1.3(a)(iii), upon a reduction of the terms, conditions,

economics, and quantity of the Stratix contract, Numerex was expressly granted the ability to

renegotiate with Orbit One the payment terms for the renewed contract.  *Id.*

As shown above, on pages 18-21, Ronsen, Rosenzweig, and Naden induced Numerex to issue

an "acceptance" of the renewed contract and Stratix's purchase order under the contract despite the

fact that no "acceptance" was required.  *See supra*, at IV.A.F.  Rosenzweig, who was the principal

contact with Stratix, admitted that he and Ronsen did not tell senior Numerex management all of the

relevant information about the Stratix situation.  Rosenzweig Dep. 295-98.  Instead, the three pushed

ahead for Numerex's acceptance of the purchase order, as Rosenzweig admitted, so that Ronsen

could take the position that Numerex owed Orbit One $1.75 million.  Rosenzweig Dep. 288-89, 310-

11, 318, 323-24; Ronsen Dep. 484.

Ronsen, Rosenzweig, and Naden's actions fell far short of their "'affirmative duty at all times

to act in [their] employer's best interests,'" and with the "'utmost good faith and loyalty'" in the

performance of their duties.  *See Maritime Fish Prods.*, 100 A.D. 2d at 87-88, 472 N.Y.S.2d at 285;

*Phansalkar v. Anderson Weinroth & Co,*. 344 F.3d 184, 200 (2d Cir. 2003) (citation omitted).  They

did not, as they were required, "make 'full disclosure' of all material facts."  *See Blue Chip Emerald*

*LLC*, 299 A.D.2d at 279, 750 N.Y.S.2d at 291.

## IX.   SUMMARY JUDGMENT SHOULD BE GRANTED TO NUMEREX ON ALL OF ROSENZWEIG AND NADEN'S CLAIMS

### A.   Rosenzweig and Naden Have No Standing to Assert Claims Based on Breach of the APA

Rosenzweig and Naden have alleged breach of contract claims, complaining that Numerex

failed to pay the Earn Out to Orbit One under the terms of the APA.  Ex. 140 ¶¶ 38-40, 47.

46

Rosenzweig and Naden lack standing to pursue breach of contract claims based on Numerex's alleged breach of the APA. It is well-settled that shareholders lack standing to assert individual claims based on injury to the corporation. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1998); *Bingham v. Zolt*, 66 F.3d 553, 561-62 (2d Cir. 1995).

### B.  Numerex Did Not Breach Rosenzweig's and Naden's SNCs

Rosenzweig and Naden seek a declaration that Numerex materially breached their SNCs by alleged failure to pay Rosenzweig and Naden six months' salary following their termination and by purportedly canceling their health insurance after they resigned. Ex. 140 ¶ 60. Numerex did not breach the SNCs on either of these bases.

As described above, Rosenzweig and Naden resigned from Numerex "other than for Good Reason." *See* Section IV.F, *supra*. Thus they are not entitled to six months' severance under their SNCs. *See* Ex. 1, Rosenzweig/Naden SNCs § 4.

Numerex also satisfied its obligations to provide health insurance post-termination. *See* Ex. 141 (Gibbons Decl. ¶¶ 7-10). Also, the alleged breach is not material. *See Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997). Accordingly this claim should be dismissed.

### C.  Rosenzweig and Naden's Tortious Interference Claim Must Be Dismissed as a Matter of Law

Rosenzweig and Naden allege that Numerex "acted intentionally and willfully to cause damage to Rosenzweig and Naden's careers" and to "interfere with their business opportunities and business relationships" "with the unlawful purpose of causing damage to Rosenzweig and Naden without justifiable cause." Ex. 140 ¶¶ 97-98. This allegation is insufficient to support a claim for tortious interference with prospective business relations.

Tortious interference requires a showing of malicious motive that "amount[s] to a crime or an independent tort." *Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d

233, 242 (S.D.N.Y. 2007); *see also American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.

1988) (no prima facie case of tortious interference where no malice shown). Indeed, Plaintiffs must

show that Numerex acted with the "*sole purpose*" of harming the Plaintiffs. *Missigman v. USI*

*Northeast, Inc.*, 131 F. Supp. 2d 495, 515 (S.D.N.Y. 2001) (granting summary judgment to defendant

where plaintiff could not establish that the defendant's sole motive was malice) (emphasis added).

"'Actions taken, at least in part, to promote or advance [defendant's] economic self-interest are, by

definition, not taken for the sole purpose of harming [plaintiff].'" *Vinas v. Chubb Corp.*, 499 F.

Supp. 2d 427, 434 (S.D.N.Y. 2007) (citation omitted). Even an "attenuated" economic motivation

"counsels against" a finding of malice. *Vinas*, 499 F. Supp. 2d at 434; *see also Pierce Ford Sales,*

*Inc. v. Ford Motor Co.*, 299 F.2d 425, 429-30 (2d Cir. 1962) (financial stake in prospective business

deal between plaintiff and third party gave defendant privilege to interfere with negotiations).

Numerex clearly has an economic interest in enforcing Rosenzweig's and Naden's

noncompetition agreements. Numerex has the right to "protect[] its existing economic interest

through legal means." *See RBFC One, LLC v. Zeeks, Inc.*, 367 F. Supp. 2d 604, 628 (S.D.N.Y. 2005)

(citation omitted). Merely seeking to enforce Rosenzweig's and Naden's noncompetition agreements

does not constitute malice, and the claim of interference with prospective economic advantage,

therefore, must fail as a matter of law. *See Vinas,* 499 F. Supp. 2d at 434.

### D.    There Is No Evidence of "Good Reason" for Resignation or Constructive Discharge

Rosenzweig and Naden seek a declaration that they resigned for "Good Reason" under their

SNCs and a declaration that they were constructively discharged. Ex. 140 ¶¶ 73, 81. But they have

not come forward with any evidence for a "Good Reason" resignation or of constructive discharge.

Pursuant to their SNCs, Rosenzweig and Naden had the ability to terminate their employment

"for Good Reason" or "without Cause." Ex. 1, Ronsen/Rosenzweig/Naden SNCs § 3(b). "Good

Reason" is defined in both SNCs as "a material breach by [Numerex] of any of its obligations to [Rosenzweig/Naden] under this Agreement" that is not cured within a certain time following written notice. Ex. 1, Rosenzweig/Naden SNCs § 3(a).

According to Naden, he and Rosenzweig participated in a telephone conference on June 2, 2007 with Numerex CEO Stratton Nicolaides and COO Michael Marett to discuss renegotiation of Rosenzweig's and Naden's compensation packages. Naden Dep. 324, 325-26. Ultimately, however, Numerex declined to pay Rosenzweig and Naden more compensation. *Id.* The two resigned two days later on June 4. *Id.* 322. The resignation, as Rosenzweig testified, was voluntary. Ex. 87 at 100.

Numerex's business decision to not provide Rosenzweig and Naden with additional compensation and to continue under their existing employment agreements is not a "material breach" under their SNCs. Ex. 1, Rosenzweig/Naden SNCs § 3(a). *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) (a breach is material when it "goes to the root of the agreement between the parties.").

## CONCLUSION

For all of the foregoing reasons, Numerex respectfully requests that the Court 1) grant Numerex summary judgment on all of Plaintiffs Orbit One and Ronsen's claims; 2) dismiss Plaintiffs Naden and Rosenzweig's claims in their entirety; 3) grant Numerex summary judgment on the issue of liability on its claims of breach of contract, breach of warranties and representations, reckless projections, fraudulent inducement, indemnification, and breach of fiduciary duty; and 4) grant such other relief as the Court may deem just and proper.

Dated: New York, New York
    April 17, 2009

Respectfully submitted,

ARNOLD & PORTER LLP

By: _____
    Kent A. Yalowitz
       *Kent.Yalowitz@aporter.com*
    Dorothy N. Giobbe
    Emily A. Kim

    399 Park Avenue
    New York, NY  10022-4690
    Telephone:  (212) 715-1000
    Facsimile:  (212) 715-1399

    *Attorneys for Numerex Corp.*